# Attachment to Memo in Support of Motion to Dismiss - Complaint

**HOLMES, TAYLOR, COWAN & JONES LLP**
Joel Athey (SBN: 214399)
joel.athey@holmestaylor.com
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017
Tel:  (213) 985-2200
Fax: (213) 973-6282

Attorneys for Plaintiff
STEPHEN BUSCHER

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN BUSCHER, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> DOUGLAS EDELMAN, an individual, and DOES 1-50, inclusive, <br><br> Defendants. | CASE NO: <br><br> **COMPLAINT FOR:** <br><br> 1. **Breach of Oral Contract;** <br> 2. **Breach of Implied-in-Fact Contract;** <br> 3. **Breach of Implied Covenant of Good Faith and Fair Dealing;** <br> 4. **Breach of Fiduciary Duty** <br> 5. **Deceit or Intentional Fraud** <br> 6. **Promissory Fraud** <br> 7. **Violation of Cal. Bus. & Prof. Code Sect. 17200, *et seq.*** <br> 8. **Conversion** <br> 9. **Unjust Enrichment** <br> 10. **Money Had and Received** <br> 11. **Intentional Interference With Contractual Relations** <br> 12. **Intentional Interference With Prospective Economic Advantage;** <br> 13. **Declaratory Relief** <br><br> **[JURY DEMAND]** |

Plaintiff, Stephen Buscher ("Mr. Buscher" or "Plaintiff"), alleges as follows:

## **INTRODUCTION**

1.     This case involves a business partnership that was undermined when Defendant Douglas Edelman ("Edelman") decided to deny his partnership with Mr. Buscher, cut Mr. Buscher completely out of the partnership's business, breach their partnership agreement, and deny Mr. Buscher an equal share in the partnership's valuable business opportunities.

2.     Mr. Buscher was a respected, successful executive with a 20-year career in the international oil & gas industry when he entered into a business partnership with Edelman in or about May 2012.

3.     Edelman is a shadowy and notorious figure in the international oil & gas market.  He helped supply jet fuel and other petrochemicals to United States armed forces during the invasion of Afghanistan after the September 11, 2001 attacks.  He made hundreds of millions of dollars in the process, but skirted Congressional scrutiny into his activities.

4.     In 2012, Edelman sought out Mr. Buscher to help Edelman look for business opportunities in which to invest his proceeds.  In May 2012, Mr. Buscher and Edelman met in Los Angeles, California, and agreed to enter into a partnership together.  At their meeting, Mr. Buscher told Edelman that he had no interest in being Edelman's employee, but was interested in a full partnership.  Edelman agreed to that.

5.     At their May 2012 meeting in Los Angeles, Edelman and Mr. Buscher entered into an agreement that Mr. Buscher would: (i) resign from his job as a successful oil & gas executive; (ii) relinquish his career and substantial income; (iii) transfer his ownership of valuable oil & gas equipment to the partnership; and (iv) devote all of his time and energy to looking for business opportunities for him and Edelman to invest in as partners.  In return, Edelman agreed to front the money for these investments.  Edelman and Mr. Buscher agreed at this meeting that they

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

would be 50-50 partners and would split any profits from the partnership evenly.

6.     Mr. Buscher spent the next six years devoted to finding business opportunities for himself and Edelman.  In 2014, he identified a promising opportunity in Mexico.  He devoted the next four years to turning the kernel of that idea into a fully-realized, proprietary, business model.

7.     Mr. Buscher then spent a number of months marketing this idea to interested oil & gas companies.  He ultimately secured a contractual agreement with a leading, global, oil & gas company, and it appeared that his partnership with Edelman was about to be very lucrative to them both.

8.     But without warning, Edelman unexpectedly stripped Mr. Buscher of any further involvement in the Mexican business opportunity, denied that he was ever in a partnership with Mr. Buscher, refused to issue Mr. Buscher a 50% equity interest in the partnership's asset (including their share of the Mexican opportunity), cut off Mr. Buscher's access to any further information about their partnership or the Mexican business opportunity, and ended all communication with Mr. Buscher.

9.     Accordingly, Edelman lured Mr. Buscher into giving up his career and salary and devote his life to scouting business opportunities.  He then cut Mr. Buscher out of their agreed-upon 50-50 partnership structure once Mr. Buscher identified and created a business opportunity that was set to be extremely profitable. Finally, he "gaslit" Mr. Buscher by pretending that they were never business partners and that Mr. Buscher was entitled to nothing.

10.    This lawsuit seeks to redress Mr. Buscher's harm and damages from Edelman's conduct.

## **THE PARTIES**

11.    Mr. Buscher is an individual who is a citizen of the State of Florida and currently resides in the District of Columbia.

12.    Edelman is an individual who is, upon information and belief, a citizen

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

of the State of California and, upon information and belief, presently resides in London, England.

13.     The defendants named herein as Does 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues such "Doe" defendants by such fictitious names.  Plaintiff is informed and believes that each fictitiously named defendant is in some manner, means, or degree responsible for the events and happenings herein alleged.  Plaintiff will seek leave of the Court, if necessary, to amend this Complaint to state the true name and capacities of the fictitiously designated "Doe" defendants, or some or all of them, when their names and capacities have been ascertained.

14.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times, Defendant Edelman, and Does 1 through 50, inclusive, and each of them, were the actual, implied or ostensible agents, servants, employees, partners, joint venturers, alter egos, and/or coconspirators of one another, and were at all relevant times described herein acting on behalf of one another within the course and scope of such agency, servitude, employment, partnership, joint venture, alter ego relationship and/or conspiracy.  Plaintiff is further informed and believes, and thereon alleges, that each defendant, whether expressly or fictitiously named, committed the acts or omissions described herein with the full knowledge, consent, authority and/or ratification of some or all of the other defendants.

## **JURISDICTION**

15.     Subject matter jurisdiction of this Court for the above-captioned proceeding is based on 28 U.S.C. §§ 1332(a) in that the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States or of a foreign state.

16.     Mr. Buscher is a citizen of the State of Florida.

17.     As described more fully below, Edelman has gone to great lengths to avoid having established residency in any particular State, although he remains a

United States citizen.  However, to the extent Edelman is a citizen of any State, upon information and belief, it is California.  Upon information and belief, Edelman was born and raised in California, resided in California for many years, and held (or holds) a California driver's license.

18.     Specific personal jurisdiction by this Court over Edelman is established by the allegations herein.  This lawsuit's fundamental core is that Edelman and Mr. Buscher made promises to each other, entered into a contractual agreement based on those promises, and created fiduciary duties to each other *while they were in the State of California*.  Those promises and agreements then governed their conduct towards each other going forward, regardless of where they were located.

19.     Mr. Buscher detrimentally relied on the promises that Edelman fraudulently made to him in California, and has suffered damages as a result.

20.     The fiduciary duties that Edelman has to Mr. Buscher were created by the agreement that he made with Mr. Buscher in California.

21.     Edelman and Mr. Buscher acted consistent with the obligations of that California-formed agreement for many years, until Edelman's breach (and related tortious acts).  Accordingly, there is a sufficient affiliation between Edelman and the State of California -- in the form of promises, agreements, activities and/or occurrences by Edelman while he was in the State of California -- to establish specific personal jurisdiction over Edelman in this forum related to the claims herein.

22.     General personal jurisdiction over Edelman is also established by virtue of the fact that, upon information and belief, Edelman is a citizen of the State of California.  While Edelman has lived outside the United States for nearly 30 years, and has gone to great lengths to avoid having a domicile in the United States, upon information and belief, if any State in the United States can claim Edelman as a citizen, it is California, based on the fact that he was born and raised in California,

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

lived in California for many years, has (or had) family residing in California, traveled to California to conduct business, has business interests in California via a company he owns that does business in the film industry, and held (or holds) a California driver's license. In addition, Edelman has purposefully availed himself of the privilege of doing business in California, including by virtue of his promises to, and agreement with, Mr. Buscher, as described more fully herein.

## VENUE

23.    Venue of this action is proper under 28 U.S.C. § 1391. As described herein, a substantial part of the events or omissions giving rise to the claims occurred in this District, making venue proper pursuant to 28 U.S.C. § 1391(b)(2).

24.    In the alternative, if there is no District in which this lawsuit may otherwise be brought -- because Edelman argues that he resides outside the United States, as described in 28 U.S.C. § 1391(c)(3) -- then Edelman can be sued in any District where the court has personal jurisdiction over him, making venue proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

**A.    Stephen Buscher Has Had A Distinguished Business Career As An Oil & Gas Executive And Has Extensive Experience Working On Petroleum-Related Transactions**

25.    Mr. Buscher has extensive financial and petrochemical experience, particularly in Russia and the former Soviet republics (now known as the Commonwealth of Independent States, or "CIS"), where he has worked in the financial sector and the oil and gas business for more than 20 years.

26.    Mr. Buscher graduated from Connecticut College in 1983. He received a Diploma from the London School of Economics in 1987, and a Master of Business Administration degree from Yale University in 1991.

27.    From 1995 to 1997, Mr. Buscher acted as Head of the Moscow office for Lazard Ltd. (formerly known as Lazard Frères & Co.), a global investment

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

bank.  There, he was the relationship manager for the bank's CIS oil business.

28.    From 1997 to 1998, Mr. Buscher acted as Co-Head of the Moscow office of international investment bank Merrill Lynch, where he was the overall relationship manager for oil business in the CIS, until Merrill Lynch shut down its Moscow office in 1998.

29.    From 2000 to 2004, Mr. Buscher acted as Head of Investment Banking at United Financial Group (which was later acquired by Deutsche Bank in 2005, after his departure).

30.    Mr. Buscher then formed Eurasia Capital Partners, a private mergers and acquisitions advisory boutique, with offices in Moscow and London.  Mr. Buscher was an active and well-known M&A specialist in the Russian market with such clients as NewsCorp, George Soros, and DeBeers.

31.    From 2005 to August 2007, Mr. Buscher was a co-founder, and served as the Chief Financial Officer, of Urals Energy Public Co., Ltd., which engaged in the exploration and production of oil and gas, as well as processing and distribution of crude oil.  Mr. Buscher oversaw its Initial Public Offering, as well as follow-on equity offerings underwritten by investment bank Morgan Stanley, and debt syndications and bond offerings underwritten by Goldman Sachs and PNB-Paribas.

32.    From August 2007 to 2009, Mr. Buscher served as the Chief Financial Officer of Terralliance Technologies, Inc., a company headquartered in Newport Beach, CA.  Terralliance was formed in 2003 by Chief Executive Officer, and former NASA engineer, Erlend Olson.  The company focused on developing and utilizing proprietary software applications, combined with traditional exploration techniques, to search for oil and gas deposits.  Terralliance developed sophisticated, underground, oil-mapping technologies and related hardware.  The company was backed by major investors such as investment bank Goldman Sachs and venture capital firm Kleiner Perkins Caufield & Byers.  Its advisors included former Secretary of State Colin Powell.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

33.     From 2010 to January 2013, Mr. Buscher served as the Executive Vice President of Sistema OJSC ("Sistema"), a large Russian conglomerate with interests in various sectors, including information technology, banking, electronics, and oil and gas.  Mr. Buscher resided in Moscow and London, and was a senior foreign investment advisor, the Chief Investment Strategist for Oil & Gas, as well as Sistema's official United Kingdom Representative.  Sistema was publicly traded on the London Stock Exchange.

34.     From September 2011 to January 2013, Mr. Buscher was also the Chief Executive Officer of Navitas Global Resources, Ltd. ("Navitas"), an oil and gas company that was jointly owned by Sistema, Glencore, and a Russian bank, Sberbank.

35.     By 2012, Mr. Buscher was an established executive in the oil & gas industry with significant experience as a banker, strategist, and executive.  It was for these attributes that Edelman sought to go into business with him.

**B.     Douglas Edelman**

36.     Edelman is a United States citizen, originally from Stockton, California.  Upon information and belief, he was born and raised in California, frequently traveled to California to visit his siblings who reside there, regularly conducted business in California, and holds (or held) a California driver's license.

37.     Edelman has lived abroad since at least the early 1990s, in Russia, Kyrgyzstan, London (United Kingdom), Portugal, and Ibiza (Spain).  He developed experience as an oil products trader in Russia and Central Asia.

38.     From 1993 to 1998, Edelman was working in Moscow, running the office of Saba Trading, a Panamanian-registered trading company that was involved in sourcing fuel and exporting it globally.  At Saba, Edelman traded commodities, primarily refined fuel products, such as jet fuel.  He had extensive expertise in fuel products trading, with final authority for trades made by Saba's Russian office.

39.     In the summer of 1995, Mr. Buscher first met Edelman, in a social

7

context, while Mr. Buscher was running Lazard Frères' office in Moscow, Russia.

40.     In early 1998, Edelman moved to Bishkek, the capital of Kyrgyzstan, in order to start and manage his own fuel trading business.

41.     In 1999, Edelman introduced Mr. Buscher to Erkin Bekbolotov and told Mr. Buscher that Bekbolotov was his new partner in the fuel trading business, as well as a close friend (from their time at school together) of the son of then-Kyrgyz President Askar Akayev.

42.     In or about 2001, Edelman and Bekbolotov formed Red Star Enterprises Ltd. ("Red Star"), a company registered in Gibraltar, to supply fuel to the Manas airport in Bishkek, Kyrgyzstan.

43.     In or about 2003, Edelman and Bekbolotov formed Mina Corp., Ltd. ("Mina") to supply fuel to the Bagram airport in Afghanistan.

44.     Upon information and belief, Edelman and Bekbolotov were each a 50% owner of Mina and Red Star.

45.     Upon information and belief, at some point after the formation of Mina and Red Star, Edelman transferred his ownership of Mina and Red Star into a trust that was in the name of his wife, Delphine Ledain, a French citizen.  Ledain has no known expertise in fuel products and was a former journalist.

46.     Between 2002 and 2010, Mina and Red Star were awarded at least four contracts by the United States Department of Defense ("DoD"), specifically through DoD's principal fuel-contracting arm, the Defense Logistics Agency-Energy ("DLA-Energy").  The contracts were to supply jet fuel and other petrochemical products to the Manas Transit Center in Kyrgyzstan, described by Congressional investigators as a "critical transport hub for U.S. troops and planes to Afghanistan."  *See* <u>Mystery at Manas – Strategic Blind Spots in the Department of Defense's Fuel Contracts in Kyrgyzstan</u>" (at p.1), attached hereto as Exhibit A (hereafter, the "Congressional Report").

47.     The Congressional Report was prepared by the U.S. House of

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

Representatives – Committee on Oversight and Government Reform – Subcommittee on National Security and Foreign Affairs ("National Security Subcommittee"), and published in December 2010.

48.    Congressional investigators valued the initial DLA-Energy contracts awarded to Mina and Red Star at $2 billion.  *See* Congressional Report at p. 1.

49.    The Congressional Report detailed that Red Star was separately awarded several other contracts to supply fuel to the United States' Bagram Air Base in Afghanistan.  *See* Congressional Report at p. 1.

50.    On November 4, 2010, DLA-Energy awarded another contract to Mina, estimated to be worth $600 million, to supply fuel to the Manas Transit Center in Kyrgyzstan.  *See* Congressional Report at pp. 5-6.

51.    DLA-Energy and the Congressional National Security Subcommittee began investigating who owned Mina and Red Star.  Congressional and DoD suspicions were aroused because -- despite: (i) awarding Mina and Red Star several billion dollars in contracts over the prior eight years; (ii) two ongoing investigations into serious allegations of corruption; (iii) significant political and diplomatic fallout for the United States in Kyrgyzstan related to corruption issues; (iv) Mina's and Red Star's "unusual behavior and hyper-secrecy;" and (v) the U.S. military's strategic reliance on the fuel they provided -- the U.S. government knew little about who owned Mina and Red Star or how they operated.  *See* Congressional Report at p. 1.

52.    Congressional investigators focused on troubling issues related to Mina and Red Star, including that they: (i) conducted a scheme to evade Russian export restrictions by soliciting false certifications from Kyrgyz officials stating that the fuel was for domestic civil consumption; and (ii) precluded competition for the Manas contracts through a concerted effort to monopolize key fuel service providers.  *See* Congressional Report at p. 3.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

9

53.     Congressional investigators concluded that Edelman undertook efforts to stonewall them to prevent Congress from learning about Edelman's true beneficial ownership of Mina and Red Star.  *See* Congressional Report at p. 3.

54.     In fact, Mina and Red Star went so far as to threaten to walk away from their lucrative fuel-supply contracts rather than reveal their ownership, cancelled scheduled meetings with Congressional investigators, and threatened to assert the Fifth Amendment.  *See* Congressional Report at p. 3.  Ultimately, Mina and Red Star did produce some documents after receiving Congressional subpoenas.  *See id*.

55.     The ultimate conclusion of Congressional investigators was that Edelman did beneficially own Mina and Red Star, along with Bekbolotov, although Edelman's ownership was formally held in a trust under the name of his wife, Delphine Ledain.  *See* Congressional Report at p. 4.

56.     Congressional investigators concluded that Ms. Ledain never had "any active role with the companies, and for all practical purposes, it would appear that Mr. Edelman controls the shares and is the *de facto* beneficial owner."  *See* Congressional Report at p. 20.

57.     Congressional investigators determined that Edelman's ownership interest in Mina and Red Star was "buried under several layers of straw ownership in jurisdictions known for their corporate secrecy.  Though many have tried, it is virtually impossible to determine the companies' beneficial ownership through corporate records."  *See* Congressional Report at p. 20.

58.     As discussed in more detail below, it became Edelman's *modus operandi* to operate his business interests through trusts that he put in his wife's name, in order to disguise his beneficial ownership and control of them, and to operate his business ventures through offshore shell corporations to obfuscate his involvement.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**C.    Edelman's Ongoing Efforts To Involve Mr. Buscher In Business Ventures With Him**

59.    In or about 2003, Edelman approached Mr. Buscher about starting a new venture to supply fuel in Afghanistan.  Mr. Buscher and Edelman discussed entering into a 50-50 partnership with respect to the fuel supply business in Afghanistan, which ultimately did not proceed.

60.    In early 2009, Mr. Buscher approached Edelman for assistance with a potential uranium project in Kyrgyzstan that Mr. Buscher was exploring.  Mr. Buscher and Edelman discussed entering into a 50-50 partnership with respect to the uranium business, and Edelman requested that Bekbolotov assist Mr. Buscher in investigating the project.  Bekbolotov travelled to Kyrgyzstan with Mr. Buscher, made some introductions, and helped Mr. Buscher obtain data about Kyrgyz natural resources.  Ultimately, the project did not proceed.

61.    In or about 2009, Edelman and Bekbolotov engaged Mr. Buscher to perform due diligence on Mina, create a valuation model for the company, and prepare an informational memorandum about it.

62.    In or about March 2010, Edelman engaged Mr. Buscher to perform due diligence and advise Edelman on whether Mina and Red Star should purchase a Danish company called Nordic Camp Supply ApS ("NCS"), a company that provided fuel globally.

63.    In or about April 2010, Mr. Buscher traveled to Denmark to negotiate a bid by Mina and Red Star to purchase NCS.  Mr. Buscher took his direction from Edelman about the offer to make to NCS.

64.    In the first half of 2010, Edelman and Bekbolotov engaged Mr. Buscher to act as their proxy in discussing Mina's fuel contracts with the Kyrgyz government.  Mr. Buscher traveled to Bishkek, Kyrgyzstan, where he spent a month working on that effort.

65.     In early 2011, following publication of the Congressional Report, Edelman sought Mr. Buscher's assistance in trying to sell his 50% share of Mina to Sistema, where Mr. Buscher served as an Executive Vice President and Chief Investment Strategist for Oil & Gas.

**D.     Mr. Buscher And Edelman Purchase Property Together**

66.     In or about April 2011, Mr. Buscher identified a property for sale in Austria.  He approached Edelman about it, with the idea that they might consider purchasing it together.  Edelman and Mr. Buscher agreed to purchase the property jointly, and to maintain it for their private use while also using it as a rental property.

67.     Edelman and Mr. Buscher originally intended for each of them to own 50% of the property.

68.     Edelman later told Mr. Buscher that he wanted his 50% ownership interest in the property to be held in the name of his unemployed brother-in-law, Frederic Ledain, a French citizen.  However, upon information and belief, the purchase funds for Frederic Ledain's portion of the property purchase did not come from an account in Frederic Ledain's name.  Rather, upon information and belief, they originated directly from Sunage Foundation ("Sunage"), a Gibraltar-registered company that was beneficially owned by Edelman.

69.     Under Austrian law, the property had to be majority owned by an EU citizen.  Therefore, Buscher paid for 49% of the property and Edelman paid for 51% of the property, but Edelman placed title of his 51% ownership interest under the name of Frederic Ledain (the brother of his wife, Delphine Ledain).

70.     Edelman and Mr. Buscher formed a corporation, Little Ajax GmbH, to own the property, with the intention that, even though Mr. Buscher would legally own 49% and Edelman would own 51% through his brother in-law (Frederic Ledain), they would each vote 50% of Little Ajax's shares.  Mr. Buscher and

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Edelman negotiated a full shareholders agreement to that effect, which Mr. Buscher then signed in or about 2011.

71.    Although Frederic Ledain is identified as the co-owner of the property, Edelman uses the property as his private property to this day.

**E.    Mr. Buscher And Edelman Enter Into The Joint Partnership Agreement**

72.    In or about May 2012, Edelman invited Mr. Buscher to meet with him in Los Angeles, California, where Edelman was caring for his older brother, who was ill.

73.    These meetings in Los Angeles were the continuation of lengthy discussions over several years between Mr. Buscher and Edelman, in which Edelman had previously tried to pursue business ventures with Mr. Buscher.

74.    By 2012, the two men had known each other for nearly 20 years, were good friends, had worked on business deals together, and owned a property together in Austria.

75.    On April 30, 2012, Edelman sent Mr. Buscher an email about an in-person meeting they had that day to discuss forming a partnership in order to pursue business opportunities together in the oil and gas industry.

76.    That same day, on April 30, 2012, Mr. Buscher wrote back to Edelman that he was "really interested in making this move and finally joining up with you." Edelman wrote back the same day that they should meet soon to decide the parameters of their partnership with the idea that Edelman would provide "the seed cash for everything and [Mr. Buscher] run it . . . ."

77.    With that precursor understanding in place, Edelman and Mr. Buscher met in Los Angeles over the course of several days in or about May 2012.

78.    During those meetings, Edelman proposed that Mr. Buscher enter into a partnership with him.

79.    Edelman said that he wanted someone with Mr. Buscher's financial skills, and oil and gas expertise, to help him invest the proceeds he had earned from

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

13

his ownership of Mina and Red Star. Edelman said he thought Mr. Buscher was ideally qualified given his experience as an executive, banker, and an investment strategist in the oil and gas industry.

80.    The final meeting between Mr. Buscher and Edelman about forming a partnership was held on or about May 9, 2012, at the Beverly Plaza Hotel in Los Angeles, California (the "May 9 Meeting"). Also present at, and witnesses to, this meeting were Mr. Buscher's former business partner, Erlend Olson, and, for portions of the meeting, Jennifer Hall.

81.    At the May 9 Meeting, Edelman requested that Mr. Buscher resign from his executive positions with Sistema and Navitas so that Mr. Buscher could devote all of his time and energy to working on oil-and-gas business ventures with Edelman. Edelman said that he would provide the investment capital needed to participate in the business ventures identified by Mr. Buscher.

82.    At the May 9 Meeting, Mr. Buscher specifically said that he was not interested in giving up his career, or substantial income from Sistema and Navitas, to become Edelman's employee, and that he would only entertain the idea if Mr. Buscher and Edelman would be 50-50 partners in their joint business ventures. Edelman agreed to this.

83.    Consequently, at the May 9 Meeting, Mr. Buscher and Edelman entered into an oral contract for the two of them to form a joint partnership (hereafter, the "Joint Partnership").

84.    The terms of the oral contract entered into by Mr. Buscher and Edelman at the May 9 Meeting featured the following material terms:

    a. Mr. Buscher and Edelman agreed that the purpose of the Joint Partnership would be to investigate, perform due diligence, and jointly pursue business ventures in the oil and gas industry;

    b. Mr. Buscher agreed to provide his oil and gas industry contacts, knowledge, and experience, and to act as the primary partner to search

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

14

for, model, diligence, value, and evaluate potential business ventures for the Joint Partnership;

c.  Mr. Buscher also agreed to assign to the Joint Partnership his proprietary rights in a piece of heavy equipment called a "seismic hammer," which was used in oil and gas exploration and drilling;

d.  Edelman agreed to provide "up front" financing for the Joint Partnership's investment in business ventures, via one or more Joint Entity, as defined below;

e.  Mr. Buscher and Edelman agreed that the Joint Partnership would form one or more corporate entities ("Joint Entity" or "Joint Entities") for any business venture that they pursued together as part of the Joint Partnership, with each of them to hold 50% ownership of any Joint Entity so formed;

f.  Mr. Buscher and Edelman agreed that each of them would be entitled to 50% of the profits from any business ventures that the Joint Partnership entered into, by virtue of their 50-50 ownership of any Joint Entity formed to pursue said business venture;

g.  Mr. Buscher and Edelman agreed that any equity invested by, or project-specific expenses incurred by, the Joint Partnership (hereafter, "Joint Partnership Expenses") would be shared equally between Mr. Buscher and Edelman.

h.  Mr. Buscher and Edelman agreed that Edelman would initially pay for the Joint Partnership Expenses, but that the Joint Partnership Expenses would be equally allocated between Edelman and Mr. Buscher.

i.  Mr. Buscher and Edelman agreed that the Joint Partnership would keep track of the Joint Partnership Expenses, and that Mr. Buscher would be "charged" 50% of the Joint Partnership Expenses, which he would

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

repay from the Joint Partnership's future profits before any distribution of those profits was made to Mr. Buscher; and

j.  Mr. Buscher and Edelman agreed that Mr. Buscher would receive an advance against his share of the Joint Partnership's future profits to pay for his living expenses ("Living Expenses Advance"), with the agreement that the Living Expenses Advance were a Joint Partnership Expense that would be borne equally by Mr. Buscher and Edelman.

85.  Hereafter, the verbal contract formed at the May 9 Meeting, and described herein, shall be referred to as the "Joint Partnership Agreement."

**F.  Mr. Buscher Detrimentally Relied On Edelman's Promises And The Joint Partnership Agreement**

86.  In reliance on Edelman's promises at the May 9 Meeting and in the Joint Partnership Agreement, on or about May 9, 2012, Mr. Buscher set up a limited liability corporation in Delaware, named Ozero LLC, to serve as his personal holding company to be the member representing Mr. Buscher in any Joint Entity that the Joint Partnership formed in order to pursue a business venture pursuant to the Joint Partnership Agreement.

87.  On or about May 23, 2012, Mr. Buscher wrote to Edelman that he was being offered the opportunity to move abroad by his then-employer, Sistema.  Mr. Buscher wrote that he preferred instead to participate in the Joint Partnership with Edelman, and that Mr. Buscher would manage his relationship with Sistema so that there would be no hurt feelings towards Mr. Buscher or Edelman when Mr. Buscher resigned from Sistema.  Mr. Buscher said that Sistema knew nothing about the Joint Partnership Agreement.

88.  That same day, Edelman wrote back to Mr. Buscher by email to say, "I am in 100 pct as I said."

89.  Also on or about May 23, 2012, Edelman wrote to Mr. Buscher by email and said that Mr. Buscher should "For SURE stay excited, keep your freedom

and let's build these into a really nice solid big time biz . . . ." (emphasis in original).

90.    The written communications by Edelman on or about May 23, 2012, are contemporaneous writings by him confirming the existence of the Joint Partnership Agreement between him and Mr. Buscher.

91.    On or about November 1, 2012, Mr. Buscher sent Edelman an email attaching a draft term sheet outlining the material terms of the Joint Partnership Agreement.

    a.    The draft term sheet noted that the two parties to the Joint Partnership would be the DLE Trust (which are Edelman's initials) and Ozero, LLC (the company Mr. Buscher formed on May 9, 2012, to represent his half of the Joint Partnership).

    b.    The draft term sheet stated that the purpose of the enterprise was to pursue a new oil and gas venture.

    c.    The draft term sheet indicated that Edelman would loan Mr. Buscher's company "funds sufficient for Ozero to be deemed to be an equal investment participant with [Edelman's] Trust."

92.    On or about November 3, 2012, Edelman wrote back and said that the draft term sheet Mr. Buscher had sent him on November 1, 2012, "looks ok" and that the "agreement between the trust and the other vehicle are fine." As described in the draft term sheet, the "trust" Edelman referred to was his DLE trust, and the "other vehicle" Edelman referred to was Ozero, LLC (Mr. Buscher's company).

93.    Edelman's written response on or about November 3, 2012, was a note or memorandum that evidenced his acknowledgment of, and agreement to, the terms of the Joint Partnership Agreement.

94.    In reliance on Edelman's promises at the May 9 Meeting, in the Joint Partnership Agreement, and in the November 2012 written correspondence described herein, on or about January 7, 2013, Mr. Buscher resigned his positions

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

as Executive Vice President of Sistema and Chief Executive Officer of Navitas.  At that point, Mr. Buscher began working fully and exclusively on behalf of the Joint Partnership.

95.   In or about July 2013, and pursuant to the Joint Partnership Agreement, Edelman began paying Mr. Buscher the agreed-upon Living Expenses Advance (which was fair given that Mr. Buscher now had no other sources of income, having relied on Edelman's promises, and that he was now committing all of his time and professional energies to the Joint Partnership).

96.   Pursuant to the Joint Partnership Agreement, the Living Expenses Advance was accounted for as an expense accrued equally to Mr. Buscher and Edelman, to be paid out of the Joint Partnership's profits and applied as a lien, until paid, against Mr. Buscher's future share of the Joint Partnership profits.

## G.   Mr. Buscher And Edelman Pursue Various Business Ventures

### 1.   Ajax Corporation

97.   In or about December 2012, Mr. Buscher used his contacts in Cyprus to register a company called Ajax Exploration, Ltd. ("Ajax").  Ozero, LLC (Mr. Buscher's company) was listed in the Cypriot formation documents as Ajax's only registered shareholder and only Member.

98.   Ajax was formed as a Joint Entity (pursuant to the Joint Partnership Agreement) as a corporate vehicle to hold the ownership rights to the seismic hammer.  Mr. Buscher and Edelman agreed that the Joint Partnership would use Ajax as the corporate vehicle to market, license, and otherwise monetize the seismic hammer by offering its use to customers in the oil and gas industry.

99.   Mr. Buscher held proprietary rights to the seismic hammer.  In reliance on Edelman's promises at the May 9 Meeting, in the Joint Partnership Agreement, and thereafter, Mr. Buscher agreed to transfer his proprietary rights to the seismic hammer to Ajax, thereby fulfilling a material term of the Joint Partnership Agreement.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

100.   No other consideration was paid to Mr. Buscher for transferring his proprietary rights to the seismic hammer to Ajax.  Mr. Buscher transferred his ownership of the seismic hammer entirely in reliance on Edelman's promises to him in the Joint Partnership Agreement and otherwise.

101.   Pursuant to the Joint Partnership Agreement, Mr. Buscher understood Ajax to be a Joint Entity that he and Edelman would own equally.

102.   On or about May 5, 2013, Mr. Buscher wrote an email to the lawyer who was helping Mr. Buscher and Edelman on the Joint Partnership's business ventures (a partner at an international law firm).  Mr. Buscher wrote that he and Edelman "would like to sign some brief letter that memorializes the relationship between me and [Edelman's] entities, and describes the intended, ultimate shareholder structure of Ajax.  The key elements are: (i) Ajax will be 50% beneficially owned by an affiliate of SSSL; (ii) 50% beneficially owned by Ozero LLC (Steve Buscher) . . . ."

103.   "SSSL" referred to Satellite Support Services Ltd. (hereafter, "SSSL"), a company beneficially owned by Edelman and registered in the British Virgin Islands.

104.   This May 5, 2013 email is further, written evidence of the Joint Partnership Agreement's terms, specifically, that Mr. Busher and Edelman were to share equally in all of the Joint Partnership's business ventures.

105.   Ajax's registered shareholder was Mr. Buscher's company, Ozero, LLC.  However, in order to honor the Joint Partnership Agreement, Mr. Buscher immediately made efforts to issue 50% ownership of Ajax to Edelman.

106.   From December 2012 to April 2014, Mr. Buscher requested on multiple occasions that Edelman identify the entity that Edelman would use to hold his 50% share ownership of Ajax so they could complete an Ajax shareholder agreement to reflect their 50-50 ownership.  However, Edelman asked Mr. Buscher

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

to hold off finalizing things because he was in the process of moving his corporate holdings from Gibraltar to the British Virgin Islands.

107.   Mr. Buscher was independently aware that this shift in Edelman's financial affairs was in progress because Edelman had originally been paying Mr. Buscher the Living Expenses Advance from Sunage, a company beneficially owned by Edelman and registered in Gibraltar.  But sometime in 2013, Edelman began paying Mr. Buscher the Living Expenses Advance from SSSL.

108.   In or about May 2013, at the same time Mr. Buscher and Edelman were negotiating an Ajax shareholders agreement (hereafter, "Ajax Shareholder Agreement"), Mr. Buscher and Edelman were also negotiating a companion Ajax Loan Agreement between Edelman's company, SSSL, and Mr. Buscher's company, Ozero.  The loan agreement stated that for any investment SSSL made into Ajax, it would issue a loan note to Ozero for 50% of that amount.

109.   The Ajax Loan Agreement memorialized that Edelman was "fronting" (through his company SSSL) Mr. Buscher's half of the equity investment in Ajax as a loan against Ajax's future profits.  Accordingly, this fulfilled a term of the Joint Partnership Agreement that Mr. Buscher was to own 50% of all Joint Entities while Edelman provided the initial funding.  The Ajax Loan Agreement shows that Edelman and Mr. Buscher considered Ajax to be a 50-50 joint equity venture.

110.   In or about February 2014, a written draft of the Ajax Shareholder Agreement was circulated via email.  Mr. Buscher discussed the draft with Edelman and his representatives.

111.   The draft Ajax Shareholder Agreement articulated that Mr. Buscher would own 50% of Ajax through his company, Ozero, and that Edelman would own the other 50% of Ajax through a company he would designate.

112.   The draft Ajax Shareholder Agreement, and written communications surrounding it, are further, written evidence of the Joint Partnership Agreement's

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

terms, specifically, that Mr. Busher and Edelman were to share equally in all of the Joint Partnership's business ventures.

113.   Despite nearly two years of discussions, a final Ajax Shareholder Agreement was never signed by Edelman and Mr. Buscher.

114.   However, this did not ultimately present a problem because the Joint Partnership later transferred ownership of the seismic hammer from Ajax, through a series of transfers, to a company called American Quantum, *see* Sect. G.4, *infra*, a Joint Entity for which Mr. Buscher was issued 50% ownership.

115.   Consistent with the idea that the investment in Ajax was a shared one for the Joint Partnership, rather than exclusive to Edelman, all Joint Partnership Expenses incurred in connection with Ajax were accounted for.  Spreadsheets were prepared by Edelman's representatives to identify Mr. Buscher's 50% obligation to pay those Joint Partnership Expenses from the total future profits of the Joint Partnership.  Mr. Buscher and Edelman's representatives had ongoing discussions about quantifying and accounting for the Joint Partnership Expenses associated with Ajax over the course of several years, culminating in December 2018.

116.   As discussed more fully below, Mr. Buscher had extensive discussions with Edelman's representative Graham Collett ("Collett") -- who was originally an audit partner at a small UK accounting firm that audited Mina and who then began working for Edelman full-time in 2011 as his personal financial controller -- about quantifying and accounting for the Joint Partnership Expenses associated with Ajax, and how they would be applied to Mr. Buscher under the Joint Partnership Agreement.

**2.     Falcon Petroleum Ltd.**

117.   In 2012, through his longstanding connections in the oil and gas industry and his contacts in Russia, Mr. Buscher identified a potential business venture for the Joint Partnership to purchase Falcon Petroleum Ltd. ("Falcon"), a small venture that held oil and gas licenses in Ethiopia.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

118.   Edelman did not have the contacts or expertise to identify the Falcon opportunity on his own.  It was Mr. Buscher's expertise that made it possible.

119.   In 2012, Mr. Buscher conducted due diligence on Falcon, and presented the business proposal to Edelman.  Edelman agreed that the Joint Partnership should proceed with purchasing Falcon.

120.   The Joint Partnership purchased Falcon in or about May 2013, through Ajax.  Mr. Buscher was identified in the agreement between Ajax and Falcon as Ajax's representative.

121.   Due to Falcon's poor performance, and identification of other more promising investments, in or about 2014, Mr. Buscher and Edelman agreed that the Joint Partnership should sell its interest in Falcon.

122.   Consistent with the idea that the investment in Falcon was a shared Joint Partnership Expense, rather than exclusive to Edelman, all costs and expenses incurred by the Joint Partnership in connection with Falcon were accounted for, and spreadsheets were prepared by Edelman's representatives to identify Mr. Buscher's 50% obligation to pay those expenses from the total future profits of the Joint Partnership.  Mr. Buscher and Edelman's representatives had ongoing discussions about quantifying and accounting for the Falcon expenses over the course of several years, culminating in or around December 2018.

123.   In April 2014, Mr. Buscher prepared a spreadsheet quantifying the Joint Partnership Expenses related to the Falcon investment and sent it to Collett for Edelman's review.

124.   This spreadsheet shows that Mr. Buscher and Edelman were keeping track of all Joint Partnership Expenses (including for Falcon) so that Edelman would be entitled to recover Mr. Buscher's share of those expenses before Mr. Buscher was entitled to take any profits from the Joint Partnership, which was a term of the Joint Partnership Agreement.

COMPLAINT

125.   Further, Mr. Buscher and Collett (on Edelman's behalf) had extensive discussions about quantifying and accounting for the Falcon expenses in or around December 2018.

### 3.   Canadian Quantum

126.   In or about the first quarter of 2014, Mr. Buscher, through his existing network of business contacts, identified an opportunity to purchase a controlling interest in Canadian Quantum, a publicly-traded oil and gas producer that was listed on the Toronto Stock Exchange.

127.   Edelman did not have the contacts or expertise to identify the Canadian Quantum opportunity on his own.  It was Mr. Buscher's expertise that made it possible.

128.   Mr. Buscher and Edelman agreed that the Joint Partnership should reinvest the funds from selling Falcon to purchase a controlling interest in Canadian Quantum.

129.   Before the Joint Partnership invested funds to purchase a controlling interest in Canadian Quantum, Edelman told Mr. Buscher that he wanted to make the investment through Lang Holding International Ltd. (BVI) ("Lang"), a company that Edelman had caused to be registered in the British Virgin Islands.

130.   At that time, Lang was, upon information and belief, owned 100% by SSSL, which was in turn beneficially owned 100% by Edelman through his company, Sunage.

131.   The problem with this idea, as Mr. Buscher saw it, was that he did not have any ownership interest in Lang, which he explained to Edelman.

132.   Collett, speaking on Edelman's behalf, told Mr. Buscher that Edelman would enter into an agreement for Lang to issue 50% of its shares to Mr. Buscher, thereby meeting the terms of the Joint Partnership Agreement, which provided that Mr. Buscher and Edelman would each own 50% of any Joint Entity that the Joint

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Partnership used to conduct the Joint Partnership's business ventures. In the case of Canadian Quantum, that Joint Entity would be Lang.

133. On or about April 3, 2014, Mr. Buscher wrote to Collett saying, "the deal that I agreed with [Edelman] back in … 2012 was that we would be 50/50, and he would loan me my share of the funds." Mr. Buscher then said, "We have also had an agreement between me and [Edelman] in place for almost 2 years."

134. Also, in or about April 2014, Mr. Buscher communicated in writing with Collett (who was Edelman's point of contact for these business discussions). They discussed Edelman issuing shares of Lang to Mr. Buscher's company, Ozero, LLC.

135. On or about April 7, 2014, Collett (on behalf of Edelman) sent Mr. Buscher an email with an attached document outlining a structure for Mr. Buscher to be issued shares of Lang.

136. These April 2014 written communications with Edelman and/or his representatives are further, written, contemporaneous evidence of the Joint Partnership Agreement, and the fact that Mr. Buscher was operating under its terms.

137. Based on these written communications and draft term sheets, in or about April 2014, Mr. Buscher understood and relied on the fact that Edelman was in the process of fulfilling his commitments under the Joint Partnership Agreement to issue him an equitable-share interest in Lang, which was the Joint Entity that the Joint Partnership was using to invest in Canadian Quantum.

138. At that time, Edelman was otherwise meeting his obligations under the Joint Partnership Agreement. Relying on Edelman's promises at the May 9 Meeting, in the Joint Partnership Agreement, and in the April 2014 written communications by which Edelman stated (via Collett) that Mr. Buscher would be issued an ownership interest of Lang, Mr. Buscher consented to having the Joint Partnership use Lang as the entity to purchase the controlling interest in Canadian Quantum.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

139.   Around the same time, another issue arose.  Edelman informed Mr. Buscher that he wanted Ajax to assign all of its rights to the seismic hammer to Lang, so that Lang could sell the seismic hammer to Canadian Quantum.

140.   In reliance on Edelman's promises at the May 9 Meeting, the Joint Partnership Agreement, and in the April 2014 written communications that Edelman would issue Lang shares to him, Mr. Buscher agreed that Ajax could transfer ownership of the seismic hammer (which Mr. Buscher had previously owned, but then transferred to Ajax in reliance on the Joint Partnership Agreement) to Lang, which in turn would sell it to Canadian Quantum.

141.   Consistent with the idea that the investment in Canadian Quantum was a Joint Partnership Expense, rather than exclusive to Edelman, all costs and expenses incurred by the Joint Partnership in connection with Canadian Quantum were accounted for, and spreadsheets were prepared by Edelman's representatives to identify Mr. Buscher's 50% obligation to pay those expenses from the total future profits of the Joint Partnership.  Mr. Buscher and Edelman's representatives had ongoing discussions about quantifying and accounting for the Canadian Quantum expenses over the course of several years, culminating in or around December 2018.

142.   The Joint Partnership acquired a controlling interest in Canadian Quantum in or about May 2014 via a private placement offering.  At the same time, Lang (which by then owned it) sold the seismic hammer to Canadian Quantum.

**4.   American Quantum**

143.   By 2015, the Joint Partnership determined that, while Canadian Quantum had made oil discoveries, due to the recent, severe decline in oil prices, it was not economically feasible to produce from the company's oil fields.  The Joint Partnership decided to extract the seismic hammer from Canadian Quantum.

144.   By this time, Mr. Buscher, through his prior business contacts, had begun working with physicists from NASA-JPL (the Jet Propulsion Laboratory)

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

and eventually secured a contract with the U.S. Department of Energy to use the seismic hammer in a series of experiments at the government's Nevada Test Site.

145.   Edelman did not have the contacts or expertise to identify the NASA-JPL opportunity on his own.  It was Mr. Buscher's expertise that made it possible.

146.   In or about May 2014, the Joint Partnership had created a corporation, American Quantum, which was a C corporation based in Nevada.  Mr. Buscher was one of two directors, and served as the President of American Quantum.  James Cecil, who worked for Edelman, was the other director of American Quantum.

147.   American Quantum was 100% owned by Lang at the time it was formed.  But Collett (on behalf of Edelman) advised Mr. Buscher that Lang had designated Mr. Buscher as an "authorized signatory" for Lang, thereby allowing Mr. Buscher to sign any documents on Lang's behalf.

148.   In or about March 2015, Mr. Buscher and Edelman agreed that the Joint Partnership should repurchase the seismic hammer from Canadian Quantum so that it could be better utilized and monetized for the benefit of the Joint Partnership.

149.   Through American Quantum, in or about March 2015, the Joint Partnership repurchased the seismic hammer from Canadian Quantum.

150.   In September 2016, American Quantum issued 50% of its shares to Mr. Buscher's company, Ozero, LLC.  That altered the ownership of American Quantum (and by extension, the seismic hammer technology) so that 50% was owned by Mr. Buscher (through his company Ozero) and 50% was owned by Edelman (through his company Lang).

151.   This was consistent with the terms of the Joint Partnership Agreement, namely that Mr. Buscher and Edelman would own everything on a 50-50 basis. And it was consistent with Edelman's promises that each investment activity would have a separate Joint Entity that was equally owned by Mr. Buscher and Edelman.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

152.    Consistent with the idea that the investment in American Quantum was a Joint Partnership Expense, rather than exclusive to Edelman, all costs and expenses incurred by the Joint Partnership in connection with American Quantum were accounted for, and spreadsheets were prepared by Edelman's representatives to identify Mr. Buscher's 50% obligation to pay those expenses from the total future profits of the Joint Partnership.  Mr. Buscher and Edelman's representatives had ongoing discussions about quantifying and accounting for the American Quantum expenses over the course of several years, culminating in or around December 2018.

## H.    Business Opportunities In Mexico

### 1.    Meeting Alberto Garza Santo and Tomas Milmo Santos

153.    In or about July 2014, Mr. Buscher was on a trip to Mexico.  While there, he spoke by phone with a Mexican businessman named Alberto Garza Santos (hereafter, "Garza Santos").  During that discussion, Mr. Buscher explained the activities of the Joint Partnership, which was always looking for attractive business ventures in the oil and gas industry.

154.    As it happened, Garza Santos was traveling at the time in Spain.  Mr. Buscher suggested that he meet Edelman (who was also in Spain at that time) in person.  Edelman and Garza Santos met in Spain via Mr. Buscher's introduction.

155.    In or about September 2014, shortly after meeting with Edelman in Spain, Garza Santos returned to Mexico, where he met in person with Mr. Buscher.

156.    During that meeting in Mexico in or about September 2014, Mr. Buscher and Garza Santos agreed that they should mutually explore business opportunities in Mexico, specifically: (i) potential uses of the seismic hammer for "upstream" oil and gas exploration and drilling in Mexico; and (ii) potential opportunities to lease a port terminal that Garza Santos had the rights to in Lazaro Cardenas, Mexico for "midstream" production and transportation of petroleum products in and out of Mexico.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

a. In the oil and gas industry, "upstream" generally refers to: (i) exploration efforts to search for petroleum deposits; and (ii) drilling and operating wells to extract petroleum products for eventual refinement.

b. In the oil and gas industry, "midstream" generally refers to: (i) transportation (by pipeline, rail, or tanker); (ii) storage; and (iii) wholesale marketing of crude or refined petroleum products.

157.   Mr. Buscher talked with Edelman on various occasions about his discussions with Garza Santos, and the potential opportunities to work with Garza Santos in Mexico.  Edelman expressed to Mr. Buscher that he thought the "upstream" and "midstream" opportunities in Mexico were promising.

158.   Mr. Buscher told Edelman that he would assume the management and supervisory roles, pursuant to the Joint Partnership Agreement, and would travel to Mexico on a weekly basis to supervise any projects that might develop in Mexico with Garza Santos.

159.   In or about October 2014, Edelman agreed, pursuant to the Joint Partnership Agreement, to fund the Joint Partnership's efforts of having Mr. Buscher explore (on behalf of the Joint Partnership) business opportunities with Garza Santos in Mexico.

160.   Garza Santos introduced Mr. Buscher to his cousin, Tomas Milmo Santos (hereafter, "Milmo Santos").  Together, Mr. Buscher, Edelman, Garza Santos, and Milmo Santos began investigating two potential business ventures in Mexico, one for "upstream" and one for "midstream" (hereafter, the "Mexican Joint Venture") as detailed further below.

161.   Before the work began in earnest, an agreement was struck between Mr. Buscher and Edelman, on the one hand, and Garza Santos and Milmo Santos, on the other hand.  It was agreed that the four men would explore the Mexican Joint Venture as a 50-50 partnership, in which an entity owned jointly by Edelman and

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

Mr. Buscher would own 50% of the Mexican Joint Venture, and an entity owned jointly by Garza Santos and Milmo Santos would own the other 50% of the Mexican Joint Venture.

162.   Garza Santos and Milmo Santos used the Mexican corporation Compañía Petrolera Perseus, SA de CV ("Perseus") as the corporate vehicle through which they would participate in the Mexican Joint Venture with Mr. Buscher and Edelman.

163.   Originally, Mr. Buscher and Edelman discussed using Lang as the corporate vehicle through which they would participate in the Mexican Joint Venture with Perseus.  But as they neared completion of an agreement with Perseus, Edelman told Mr. Buscher to instead use a company called Comporta (registered in Holland) as the corporate vehicle through which the Joint Partnership would participate in the Mexican Joint Venture with Perseus.  Then, on or about the day before formal documents were planned to be signed with Perseus, Edelman changed his mind again and wanted to use the Dutch corporation, Lanius B.V. ("Lanius") as the corporate vehicle through which the Joint Partnership would participate in the Mexican Joint Venture with Perseus.  Ultimately, the Joint Partnership used Lanius as its vehicle for participating in the Mexican Joint Venture with Perseus.

164.   At this time, it was Mr. Buscher's understanding and expectation that he would be issued 50% of the shares of Lanius (making him a 25% owner of the Mexican Joint Venture), consistent with Edelman's promises at the May 9 Meeting and in the Joint Partnership Agreement.

**2.     Mr. Buscher Upends His Life To Explore The Mexican Business Opportunities On Behalf Of The Joint Partnership**

165.   In late 2014, Mr. Buscher moved to Salt Lake City, Utah so that he would have a base of operations that would allow him to travel frequently to Mexico in order to explore the Mexican Joint Venture's business opportunities

COMPLAINT

there.  By contrast, Edelman continued to live in Europe and remained largely uninvolved in the Joint Partnership's efforts to explore "upstream" and "midstream" opportunities via the Mexican Joint Venture.

166.    From late 2014 to 2018, Mr. Buscher made dozens of trips to Mexico, visiting either Monterrey or Mexico City.  In the second half of 2015, he moved his family to Mexico for several months in order to work on the Mexican Joint Venture.  By contrast, Edelman only traveled to Mexico three times between 2014 and 2018.  In short, the Joint Partnership's efforts to be involved in the Mexican Joint Venture were being entirely run and spearheaded by Mr. Buscher, as Mr. Buscher had promised to Edelman as a term of the Joint Partnership Agreement.

### 3.    Exploring The "Upstream" Strategy

167.    The first potential venture that the Mexican Joint Venture explored involved the potential "upstream" use of the seismic hammer to explore for oil and gas in a potential project with PEMEX, the Mexican state-owned petroleum company (hereafter, the "Upstream Strategy").

168.    To facilitate the Upstream Strategy, the four partners to the Mexican Joint Venture agreed to form a company, Kaban Energia ("Kaban"), which would approach the Mexican government about using the seismic hammer in PEMEX's oil fields.

169.    Mr. Buscher, Edelman, Garza Santos, and Milmo Santos negotiated a shareholders agreement for Kaban, which memorialized its ownership structure (hereafter, the "Kaban Shareholders Agreement").  In the Kaban Shareholders Agreement, it was agreed that Perseus would receive 50% of Kaban's shares and Lanius would receive the other 50% of shares.  It was also agreed that Perseus and Lanius would evenly share in all expenses and profits of Kaban.

170.    By virtue of the Kaban Shareholders Agreement, Mr. Buscher should have been a 25% owner of Kaban, although he was still waiting for Edelman to

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

follow through on his commitment to have Lanius issue a 50% ownership interest to Mr. Buscher.

171.   From 2014 to 2016, Mr. Buscher and Milmo Santos had more than a dozen meetings with senior Mexican petroleum officials about potential uses for the seismic hammer at PEMEX oil fields at Suresta del Norte Basin in Tabasco, Mexico.

172.   In or about 2016, Mr. Buscher and Milmo Santos secured the interest of PEMEX in working with Kaban to use the seismic hammer at its oil fields in Tabasco, Mexico.

173.   However, once PEMEX had expressed its serious interest in working with Kaban to use the seismic hammer, Perseus insisted that Lanius pay all of the expenses associated with using the seismic hammer, which was inconsistent with the Kaban Shareholders Agreement's provisions that costs were to be borne equally by Perseus and Lanius.

174.   Dissatisfied with Perseus' attempt to alter the Kaban Shareholders Agreement, Mr. Buscher and Edelman discussed it and decided they no longer wanted to explore the Upstream Strategy, or the opportunity to work with Perseus (via Kaban) to provide the seismic hammer to PEMEX.  Accordingly, the Upstream Strategy was abandoned by the Mexican Joint Venture.

175.   Instead, the Joint Partnership turned its attention to the Midstream Strategy.

**4.    Exploring The Midstream Strategy**

176.   The second potential venture that the Mexican Joint Venture explored involved a "midstream" strategy by which petroleum products would be transported across Mexico via pipeline between the port at Lazaro Cardenas (on the Pacific Coast) and a port on the Gulf of Mexico (later identified as Tuxpan).  This strategy would allow petroleum products to be imported into Mexico by sea in tankers to either the Pacific Coast or the Gulf of Mexico, and then distributed throughout

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

much of Mexico via pipelines from those port terminals (hereafter, the "Midstream Strategy").

177.   To facilitate the Midstream Strategy, the four Mexican Joint Venture partners agreed to form a company, Sirius Energy SA de CV (hereafter, "Sirius"). Pursuant to their original agreement that all Mexican Joint Venture projects would be done on an equal basis, the four Mexican Joint Venture partners agreed that Perseus would own 50% of Sirius and Lanius would own the other 50% of Sirius.

178.   In or about 2015, while Perseus and Lanius were also working on the Upstream Strategy via Kaban, Mr. Buscher proposed to Edelman that they bring in a consulting team to analyze the Mexican market and devise a "midstream" business plan to implement the Midstream Strategy.

179.   Mr. Buscher recommended using Pareto Commodity Partners ("Pareto"), a specialized commodity trading boutique led by Dick Jefferis and Roy Piscadlo, who were both personally well known to Mr. Buscher.

180.   Edelman did not have the contacts or expertise to identify Pareto (or any other comparable consultant) on his own.  It was Mr. Buscher's expertise that made it possible.

181.   Edelman agreed to Mr. Buscher's proposal to hire Pareto.

182.   From that point forward, Pareto joined Mr. Buscher on his frequent trips to Mexico to explore the Midstream Strategy.  Together, Mr. Buscher and Pareto built a sophisticated and proprietary Mexican nationwide energy storage, transportation, and trading model.

183.   As part of this work, Pareto worked with Mr. Buscher to develop proprietary and cutting-edge, computer-modelling algorithms to perform linear programming analysis and to devise regression-based, optimal, "first mover" strategies in the petroleum field.  Mr. Buscher and Pareto referred to this strategy as the "Isthmus Strategy," and it became the fulcrum of the Midstream Strategy.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

184.   The concept behind the Isthmus Strategy was to use the port at Lazaro Cardenas (on the Pacific Coast) and build a rail and pipeline transit link eastward through the greater Mexico City market, terminating at the port of Tuxpan, Mexico (on the Gulf of Mexico).  The Isthmus Strategy would allow petroleum products to be transported throughout Mexico, and to utilize seaports on both ends.

185.   Edelman paid Pareto for its consulting work via SSSL (from which Edelman was also paying Mr. Buscher's Living Expenses Advance).  However, consistent with the Joint Partnership Agreement, Edelman accounted for and applied a lien against Mr. Buscher's future profits from the Joint Partnership for 50% of the costs and expenses associated with Pareto and developing the Isthmus Strategy.  This confirms Edelman's understanding and view that he and Mr. Buscher were 50-50 partners who would share all expenses and profits in the Midstream Strategy pursuant to the Joint Partnership Agreement.

186.   Mr. Buscher had been working to finalize a written Sirius shareholder agreement to memorialize that Perseus and Lanius each owned 50% of Sirius (hereafter, the "Sirius Shareholder Agreement").  Working with the same U.S.-based counsel that Mr. Buscher engaged to represent the Joint Partnership in other matters, Mr. Buscher negotiated the terms of the Sirius Shareholder Agreement with Perseus on behalf of himself and Edelman.

187.   In or about March 2016, Perseus and Lanius signed the Sirius Shareholder Agreement, by which Perseus and Lanius each own 50% of Sirius.

## I.   Issuance of Shares In Lang And/Or Lanius

188.   While he was separately spearheading the negotiations with Perseus on the Sirius Shareholder Agreement, Mr. Buscher was also speaking privately with Edelman about the fact that he had still not been issued 50% ownership of Lanius, despite Edelman's repeated promises that Mr. Buscher would receive those shares. This was a continuation of a long discussion on that subject, first with respect to Lang, and later with respect to Lanius, as outlined below.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

189.   On or about April 7, 2014, Mr. Buscher had written communications via email with Collett (who represented Edelman for such purposes) about signing a Lang Shareholder Agreement and having Lang issue Mr. Buscher shares.

190.   On or about May 6, 2014, Mr. Buscher had further written communications by email with Edelman (via his representative Collett) about finalizing the Lang Shareholder Agreement and Mr. Buscher being issued shares in Lang.

191.   On or about December 2, 2015, Mr. Buscher had further written communications by email with Edelman (via his representative Collett) about the fact that he had not yet been issued his Lang shares and felt that his contract with Edelman needed to be addressed.

192.   The conversations about being issued shares of Lang in 2014 and 2015 were a precursor to the same conversations in 2016 onward about being issued shares in Lanius.  Lang was originally the entity that would represent the Joint Partnership in Sirius, which is why Mr. Buscher sought to be issued 50% of Lang's shares.  Later, Edelman changed the structure so that Lanius entered into the Sirius Shareholder Agreement in March 2016 with Perseus on behalf of the Joint Partnership.  But whether it was Lang or Lanius, it was all part of the same discussion whereby Mr. Buscher wanted to receive a 50% share of any Joint Entity being used by the Joint Partnership to invest in Sirius.

193.   On or about April 28, 2016, Mr. Buscher had written communications with Edelman (via his representative Collett).  In those email discussions, Mr. Buscher said that he was coming to London and wanted to meet with Edelman and his representatives to finalize the Lang/Lanius Shareholder Agreement.  He reminded Collett in these written communications that he owned 25% of Sirius, which Edelman and his representatives did not dispute.

194.   On or about July 8, 2016, Mr. Buscher wrote by email to Edelman, Collett and Remco Polderman (hereafter, "Polderman"), a Dutch specialist in

COMPLAINT

creating offshore tax minimization holding structures, who: (i) advised Edelman on tax structuring issues; (ii) oversaw the migration of Edelman's trust and holding companies from Gibraltar to the British Virgin Islands in 2016; and (iii) created a revocable grantor trust, registered in the British Virgin Islands, named Atlas Trust, just as the work to create Sirius began in earnest and which Edelman would use as his entity to hold his interest in the Sirius project.

195.   In the July 8, 2016 email communication, Mr. Buscher said that he wanted to be issued his shares in Lanius.  Edelman wrote back to Mr. Buscher the same day saying, "I see no issue overall in all of this.  We just need to get it done is all."  This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

196.   On or about July 11, 2016, Collett (on behalf of Edelman) wrote to Mr. Buscher by email, attaching a document that included an accounting of the Joint Partnership Expenses going back to the Joint Partnership's inception in 2012.  This was sent to Mr. Buscher so that he could review the 50% of the Joint Partnership Expenses being attributed to him (which was a term of the Joint Partnership Agreement).

a.   The same day, on or about July 11, 2016,  Mr. Buscher wrote to Edelman (via his representative Collett) by email saying, "The original arrangement was that I was 50/50 with [Edelman's] Trust and that once the Trust recovered its capital then I would share in my portion of the profits."

b.   The same day, on or about July 11, 2016, Collett (on Edelman's behalf) wrote back to Mr. Buscher by email saying that Edelman was in agreement about issuing Mr. Buscher shares of Lanius, but that it was important to have a proper accounting of all Joint Partnership Expenses as the "basis of implementing the agreement whereby the

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Trust recovers its loans (as shown in the draft accounts) before anyone gets anything."

c. This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius and share equally in all Lanius profits after paying for his share of the Joint Partnership Expenses.

197. On or about October 2, 2016, Mr. Buscher wrote to Edelman (via his representative Collett) by email to say that he and Edelman were virtually 100% agreed on a Lanius Shareholder Agreement and issuance of his Lanius shares and that Mr. Buscher thought they were ready to sign documentation.

198. On or about November 21-22, 2016, Mr. Buscher wrote to Edelman (via his representative Collett) by email about being issued shares of Lanius.

a. On or about November 21-22, 2016, Collett (on Edelman's behalf) wrote back to Mr. Buscher by email saying that he thought Mr. Buscher and Edelman were "quite close to completing all the documentation" to issue Lanius shares to Mr. Buscher.

b. This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

199. On or about December 7, 2016, Mr. Buscher wrote to Edelman (via his representative Polderman) by email requesting to have Edelman sign a Lanius Shareholders Agreement and issue him 50% of Lanius' shares.

a. That same day, on or about December 7, 2016, Polderman (on Edelman's behalf) wrote back to Mr. Buscher by email that "we could sign the [Lanius Shareholders Agreement] and transfer shares once

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

compliance done, could also add a clause to the [Lanius Shareholders Agreement]."

   b.   This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

200.   On or about December 8, 2016, Mr. Buscher wrote to Edelman (via his representative, Polderman) by email and said that he had provided all requested financial information and wanted to sign the Lanius Shareholders Agreement before the end of 2016.  Mr. Buscher told Polderman that he had "been attempting to put any documentation in place for 3 years . . . ."

201.   On or about March 17, 2017, Mr. Buscher had further written communications with Edelman (via his representative, Polderman).

   a.   That same day, on or about March 17, 2017, Mr. Buscher wrote to Edelman (via Polderman) by email, attaching a draft of the Lanius Shareholder Agreement and said that he thought it was a final version ready for signature.

   b.   That same day, on or about March 17, 2017, Polderman (on Edelman's behalf) wrote back to Mr. Buscher by email and noted that Collett was still waiting for further financial information to quantify the Joint Partnership Expenses.

   c.   That same day, on or about March 17, 2017, Mr. Buscher wrote back to Edelman (via Polderman) by email saying, "waiting for more financial information is a false dichotomy. . . . *it has been three years I've been trying to shake agreements out of the 'trust' . . . .*" (emphasis in original).

   d.   That same day, on or about March 17, 2017, Polderman (on Edelman's behalf) wrote back to Mr. Buscher via email saying that he was just

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

doing a final review of the documents before finalizing the Lanius Shareholder Agreement.

   e. This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

202. In or about April 2017, Edelman (via his representative Polderman) sent Mr. Buscher a draft Lanius Shareholder Agreement.

203. On or about April 19, 2017, Mr. Buscher wrote to Edelman (via his representative Collett) by email saying that his work for the Joint Partnership over the years included work on various projects, including, Ajax, Canadian Quantum, American Quantum, and Sirius.

   a. Mr. Buscher wrote to Collett, "We have been working to memorialize my relationship to the [Joint Partnership] and the above projects . . . While it has been recently agreed by me, you, and Remco Polderman . . . that the body of the documents is in final acceptable form, we have yet to sign these agreements.  However, it is my understanding that we still plan to execute these agreements in the next few days."

   b. This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

204. On or about April 27-28, 2017, Mr. Buscher wrote by email to Edelman (via his representatives Collett and Polderman) to say the Lanius Shareholder Agreement should be signed soon.

   a. On or about April 27-28, 2017, Collett wrote back to Mr. Buscher by email to say that he was working to get sign off on the Lanius

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Shareholder Agreement that day and would coordinate with Polderman about getting signatures from Edelman.

   b.  This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

205.  On or about May 25, 2018, Mr. Buscher wrote by email to Edelman (via his representatives Collett and Polderman) saying it was important that he be issued his Lanius shares.

   a.  That same day, on or about May 25, 2018, Collett (on behalf of Edelman) wrote back to Mr. Buscher by email to say that he would have a full response to Mr. Buscher the following week.

   b.  This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

206.  On or about November 20, 2018, Mr. Buscher wrote by email to Edelman (via his representative Collett) saying it was important that he be issued his Lanius shares.

207.  On or about November 28, 2018, Mr. Buscher wrote by email to Edelman (via his representative) saying he was at his "wits end" about not having his Lanius shares issued as promised.

   a.  That same day, on or about November 28, 2018 Collett (on behalf of Edelman) wrote back to Mr. Buscher by email to say that he was not avoiding discussing issuance of the Lanius shares and saw "no issue in getting this matter wrapped up by year end."

   b.  This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

208.   Despite repeated promises over many years, Mr. Buscher has never been issued 50% of the shares in Lanius.

**J.     Mr. Buscher Prepares The Promotional And Sales Materials For The Midstream Strategy And Begins Negotiations With A Supermajor Oil Company**

209.   In or about December 2017, the Midstream Strategy was nearing the point where it could be taken out to the market.  By this time, Sirius had secured the terminal leases in Mexico City and the port in Tuxpan.  Combined with the terminal leases that Garza Santos already controlled in Lazaro Cardenas, Sirius now had all the pieces of infrastructure needed to successfully implement the Midstream Strategy.  And Sirius had secured a framework agreement with Cemex to construct the distribution terminals at their inland Mexican operational locations.

210.   At this point, Mr. Buscher had completed drafting an informational memorandum about Sirius that outlined the Midstream Strategy, including a description of the proprietary Isthmus Strategy (hereafter, the "Sirius Informational Memorandum").  The Sirius Informational Memorandum would serve as the marketing framework by which Sirius would attempt to attract investors regarding the Midstream Strategy.  Typically, an informational memorandum of this type would be prepared by an investment bank for a hefty retainer fee and success fee.  Mr. Buscher solely prepared the Sirius Informational Memorandum.

211.   In or about January 2018, Sirius distributed the Sirius Information Memorandum to a limited number of potential partners, including a supermajor oil company, identified herein as "Supermajor."

212.   From January through March 2018, Mr. Buscher began making a number of presentations to potential partners who had reviewed the Sirius Information Memorandum.  In each case, Sirius executed a Non-Disclosure

Agreement with the potential partner before disclosing the Sirius Information Memorandum.

213. Mr. Buscher led all of these presentations to potential partners. Frequently, he presented alone. Sometimes, he was joined by some combination of Ron Thomas (the terminal construction project manager retained by Lanius) or Andres Valezqez and Daniel Santos from Perseus.

214. On or about February 21, 2018, Edelman and Christopher Slabozsewicz (hereafter, "Slabozsewicz") bumped into Supermajor's Senior Originator for Biodistillate Trading (hereafter referred to as "Executive 1") on the open conference floor at a conference in London. Edelman initiated conversation with Executive 1 regarding Edelman's interest in selling to Supermajor his interest in facilities in Salalah, Oman. Slabozsewicz was initially Edelman's principle banker at BNP-Paribas in Geneva, Switzerland. Slabozsewicz was also placed on the Board of Directors of Sirius by Edelman, and at that time served as a Sirius director for Edelman's interests.

215. After Executive 1 expressed no interest in Edelman's facilities at Salalah, Oman, Edelman and Slabozsewicz then began to discuss Lanius' work in Mexico. Executive 1 was intrigued by the Midstream Strategy. Edelman told Executive 1 that Mr. Buscher was in charge of the project for Sirius and that Supermajor should meet with Mr. Buscher.

216. On or about February 22, 2018, Mr. Buscher, Edelman, and Slabozsewicz met in London with Executive 1 and two other Supermajor executives. During the meeting, Mr. Buscher outlined his own lengthy history working on transactions with Supermajor, as well as the details of the Sirius project.

217. At the meeting on or about February 22, 2018, Mr. Buscher made a 90-minute presentation to the Supermajor executives. At the end of the meeting, Supermajor asked Mr. Buscher to make the same presentation to a broader group of Supermajor executives at its North American headquarters.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

218.    On or about March 30, 2018, Supermajor signed a Non-Disclosure Agreement, sent to it by Mr. Buscher, related to Sirius and the Midstream Strategy.

219.    On or about April 13, 2018, at the direction of Mr. Buscher, Sirius sent the Sirius Information Memorandum to Supermajor, including an executive who works in Supermajor's Biofuels Business Development – Integrated Supply & Trading (hereafter referred to "Executive 2") who is also based at Supermajor's North American headquarters.

220.    On or about May 11, 2018, Mr. Buscher and Ron Thomas traveled to Supermajor's North American headquarters to meet with Supermajor's executives. Mr. Buscher led a three-hour meeting with Supermajor's executives and walked them through the Midstream Strategy that Sirius was proposing.  Present at the meeting for Supermajor were more than 10 executives attending in person, and others participating via video link from London and Houston.

221.    When the meeting concluded, Mr. Buscher met with Supermajor's Managing Director, Latin America – Integrated Supply & Trading (hereafter referred to as "Executive 3").  Mr. Buscher proposed that Supermajor and Sirius enter into exclusive discussions to build a "midstream" petroleum system together in Mexico in order to service Supermajor's operations there.  Executive 3 agreed with Mr. Buscher's proposal for Supermajor and Sirius to enter into an initial Memorandum of Understanding for Supermajor and Sirius to explore developing a "midstream" petroleum system in Mexico (hereafter, the "Initial MOU").

222.    On or about May 15, 2018, Executive 3 sent Mr. Buscher a draft of the Initial MOU.  In his cover email, Executive 3 thanked Mr. Buscher for attending the in-person meetings with Supermajor personnel at their North American headquarters the week before.  Executive 3 also said that he was excited by the possibility of Supermajor and Sirius potentially working together on the Midstream Strategy.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

223.   By contrast to Mr. Buscher's leading role and key involvement in the negotiations with Supermajor, Edelman never met with anyone on Supermajor's working team about the Sirius deal.  To the contrary, Edelman told Mr. Buscher by text multiple times that he could never attend any meetings with Supermajor because it might raise issues about his ownership interest of Sirius.

224.   Mr. Buscher negotiated the terms of the Initial MOU with Supermajor, and signed the Initial MOU on behalf of Sirius, before Garza Santos or Milmo Santos had ever met with anyone from Supermajor.

225.   Between May 24, 2018, and May 29, 2018, Supermajor and Sirius signed the Initial MOU.

226.   Supermajor and Sirius deliberately kept the Initial MOU somewhat vague because it was agreed that a more definitive MOU would be entered after Supermajor and Sirius had formed a working group and developed a more specific plan for the proposed partnership and the Midstream Strategy.  The Initial MOU stated:

> "The Parties wish to explore projects (the "Potential Transactions") relating to [Supermajor's] strategies to:
>
> (i)     supply crude oil and oil products (including gasoline, diesel, jet and liquefied natural gas) to Mexico, and to offtake crude oil and products (including fuel oil) from Mexico; and
>
> (ii)    access advantaged infrastructure to support [Supermajor's] expanding retail and wholesale businesses in Mexico.
>
> Depending on the progress of the discussions and assessments, the Parties may begin negotiation of one or more definitive agreements to further the Potential Transactions."

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## K.   Under Mr. Buscher's Leadership, Sirius Moved Closer To A Final Agreement With Supermajor Regarding The Midstream Strategy

227.   After entering into the Initial MOU with Supermajor, Mr. Buscher arranged a series of follow-on working groups meetings and negotiation sessions with Supermajor.  Over time, Mr. Buscher began introducing personnel from Perseus to Supermajor.

228.   On or about June 14, 2018, Mr. Buscher introduced Andres Valezquez (from Perseus) to Supermajor by taking him to a meeting at Supermajor's North American headquarters.

229.   On or about June 14, 2018, a senior Supermajor executive based in London (hereafter referred to as "Executive 4"), sent Mr. Buscher and Velazquez an email thanking them for the in-person meeting that day and proposing another in-person meeting at Supermajor's North American headquarters in early-July 2018.

230.   In or about mid-June 2018, Supermajor personnel visited the proposed Sirius facilities in Lazaro Cardenas and Tuxpan, Mexico to assess the sites and begin considering the work that Sirius and Supermajor could do together.

231.   In or about July 2018, Mr. Buscher introduced Garza Santos and Milmo Santos to Supermajor personnel at a meeting at Supermajor's North American headquarters.

232.   During the summer of 2018, Sirius and Supermajor worked together to build a joint "midstream" model for Mexico.  Mr. Buscher led the project from the Sirius side.  Mr. Buscher provided instruction to Daniel Santos, who worked for Perseus, to create certain models using Mr. Buscher's specifications.

233.   In or about July 2018, Mr. Buscher and Milmo Santos participated in a negotiation session with Supermajor at Supermajor's North American headquarters.

   a.  At the meeting, Executive 3 introduced them to the lead, in-house attorney at Supermajor who would be responsible for Supermajor's negotiations with Sirius (hereafter referred to as Executive 5).

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

b. At those meetings, it was agreed that Supermajor should communicate with Sirius by corresponding simultaneously with both Mr. Buscher and Federico Gil, Perseus's in-house counsel. That way Lanius and Perseus were both getting the same information at the same time.

234. In or about September 2018, Sirius (led by Mr. Buscher) and Supermajor held a week of working group meetings and negotiation sessions at Supermajor's offices in Mexico City.

235. After the meetings in Mexico City, Mr. Buscher continued negotiating the Sirius "midstream" opportunity with Supermajor's Liquified Natural Gas ("LNG") specialist (hereafter referred to as "Executive 6"). That involved continuing to model the Midstream Strategy, which effort was spearheaded by Mr. Buscher on behalf of Sirius.

236. Together, Mr. Buscher and Executive 6 create an LNG re-gasification plan for Mexico's largest, gas-fired, power plant located in Lazaro Cardenas, as well as a Mexican nationwide liquefied petroleum gas ("LPG") distribution system.

237. In or about November 2018, Supermajor and Sirius agreed that they were ready to sign the detailed follow-on MOU describing the Mexican "midstream" venture's specific projects (hereafter, the "Formal MOU").

**L.  Internal Issues At Sirius Between Perseus And Lanius Began To Develop**

238. In or about December 2018, Sirius was nearing the point where it would enter into the Formal MOU with Supermajor that would specifically outline the scope of work and the precise relationship between Sirius and Supermajor for their work in Mexico.

239. However, Mr. Buscher was becoming increasingly concerned that Perseus might try to undercut Lanius in the deal with Supermajor.

240. Mr. Buscher's concern was heightened by the fact that the only legal signatories with authority to bind Sirius were Federico Gil and Andres Valezquez, both of whom were Perseus personnel.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

241.   Mr. Buscher felt that Perseus and Lanius should hold a Sirius Board of Directors meeting and agree on certain corporate resolutions needed before the Formal MOU with Supermajor was signed, in order to ensure that Perseus and Lanius were on the same page about how Sirius would operate.

242.   Mr. Buscher explained to Edelman why he thought Lanius needed to insist that Perseus agree to have Sirius issue new Board resolutions to facilitate the next step on the deal with Supermajor before the Formal MOU was signed.

243.   Mr. Buscher told Edelman that Lanius should suggest to Perseus a date in early December 2018 for a meeting of Sirius' Board of Directors in Monterrey, Mexico.  And Mr. Buscher suggested that he and all of Edelman's people working on the Sirius deal for Lanius should travel to Monterrey, Mexico for the meetings.

244.   Edelman agreed to travel to Monterrey, Mexico for a meeting of the Sirius Board of Directors.  This meeting would constitute Sirius' first annual general meeting ("AGM") since its formation.

245.   Mr. Buscher also recommended to Edelman that Lanius replace James Cecil as a Lanius-appointed director of Sirius in favor of Jerome Schurink, who also worked for Edelman.  Mr. Schurink was formerly a finance director at Procter & Gamble Co., before becoming Chief Financial Officer, Chief Operating Officer and Chief Investment Officer of Gunvor Group Ltd. (which exported oil from Russia).  Edelman agreed with Mr. Buscher's suggestion.

246.   Mr. Buscher, Edelman, Slabozsewicz, Tom Ehr ("Ehr"), and Schurink all flew from Europe to Monterrey, Mexico for the Sirius AGM that was scheduled for December 3, 2018.

247.   On December 3, 2018, Mr. Buscher arranged a breakfast meeting for the Lanius representatives, which was to take place before the Sirius AGM.  Present at the meeting were Mr. Buscher, Edelman, Slabozsewicz, Ehr, and Schurink.

248.   During the breakfast meeting, Mr. Buscher explained his suspicions that Milmo Santos might be improperly suggesting to Supermajor that Sirius was a

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

46

subsidiary of Perseus, and/or that Perseus was secretly conducting negotiations directly with Supermajor that Lanius was unaware of, which would be contrary to both the Sirius Shareholder Agreement and the specific agreement reached in July 2018 at Supermajor's North American headquarters (attended by Supermajor, Perseus, and Lanius personnel) that all Sirius-related meetings and communications would involve Supermajor, Perseus, and Lanius.

249.   Mr. Buscher informed the others at the breakfast meeting that he learned from Andres Velazquez (who worked for Perseus but was friendly with Mr. Buscher) that Milmo Santos might have implied to Supermajor that Sirius was a subsidiary of Perseus rather than a fully stand-alone entity owned equally by Perseus and Lanius.

250.   At the breakfast meeting on December 3, 2018, Mr. Buscher also said that Sirius needed to pass some specific corporate resolutions at the AGM in light of the near-final negotiations with Supermajor about the Formal MOU.

251.   Specifically, Mr. Buscher said Sirius should pass resolutions: (i) confirming Milmo Santo to act as Sirius' CEO and Chairman; (ii) replacing Cecil with Schurink as a Lanius-appointed Director of Sirius; (iii) confirming that all meetings and negotiations between Supermajor and Sirius must be conducted with at least one representative each from Lanius and Perseus present; and (iv) to confirm which outside law firm Sirius would use to represent it in the negotiations with Supermajor about the Formal MOU, rather than using Perseus's in-house counsel, Federico Gil, for those negotiations.

252.   The Sirius AGM was scheduled to begin at 11:00 a.m. on December 3, 2018.

253.   However, before the Sirius AGM meeting could begin, Lanius was informed that, due to a scheduling mix-up, Garza Santos was not in town and Milmo Santos would not be available until later that afternoon.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

254.   At or around 5:30 p.m. on December 3, 2018, Milmos Santos arrived at his office, but told the Lanius representatives present -- Mr. Buscher, Edelman, Slabozsewicz, Ehr, and Schurink -- that any Sirius AGM meeting would have to be brief as he had another engagement and was short on time.

255.   In fact, the Sirius AGM was very short.  Milmo Santos informed the Lanius representatives at 7:00 p.m. that he was leaving.  As he was preparing to leave, Mr. Buscher informed Milmo Santos that there were a number of agenda items that Lanius wanted to have voted on by the Sirius Board at this AGM. Among them were reports that Perseus was telling Supermajor that it was in charge of the projects and that Sirius was just its subsidiary.  Milmo Santos responded that of course he agreed Perseus was not the parent of Sirius, but appeared nervous and left hastily.

256.   On or about December 19, 2018, Mr. Buscher was scheduled to have a conference call with Executive 3 of Supermajor and Milmo Santos to discuss next steps after the Formal MOU was signed.

257.   It was expected, as it had been previously discussed and agreed between Sirius and Supermajor, that Supermajor would prepare and circulate the first draft of the Formal MOU and send it to Perseus and Lanius for review and comment.

258.   On December 19, 2018, Mr. Buscher was on a call with Andres Velazquez (from Perseus) who told him that Supermajor had, in fact, circulated a draft of the Formal MOU on December 17, 2018, but that it was only sent to Federico Gil (who worked for Perseus).  This was contrary to the protocol that Supermajor, Lanius, and Perseus had worked out in July 2018, by which Lanius and Perseus were supposed to simultaneously receive all communications from Supermajor, and particularly about something as important as a draft of the Formal MOU.

COMPLAINT

259.   On or about December 19, 2018, Mr. Buscher got on the conference call with Supermajor.  No one from Perseus was on the line yet, but representatives of Supermajor were on the line.  Mr. Buscher asked if it was true that Supermajor had circulated a draft of the Formal MOU to Sirius, and was told that Supermajor had.  In fact, the Supermajor personnel on the call seemed surprised that Mr. Buscher had not yet seen the draft of the Formal MOU because it was sent to Federico Gil.

260.   Mr. Buscher asked that Supermajor send the draft of the Formal MOU to him and Federico Gil simultaneously, so everyone could be working off the same copy.  Supermajor personnel said that they would make sure it happened that way.

261.   Immediately after the call, on or about December 19, 2018, Perseus sent to Lanius a draft of the Formal MOU that had been redacted and edited by Perseus (hereafter, the "Redacted MOU").  By this time, Lanius had still not seen the original draft of the Formal MOU that Supermajor sent to Perseus on December 17, 2018.  Rather, Lanius had only received the Redacted MOU from Perseus.

262.   On December 19, 2018, Mr. Buscher and Edelman were both physically present at their property in Austria.

263.   On December 19, 2018, Mr. Buscher relayed to Edelman the substance of his call that day with Supermajor, as well as a copy of Redacted MOU sent to him by Perseus.  Edelman said that he was upset that Perseus was not sending Lanius the unredacted draft of the Formal MOU that Supermajor sent to Federico Gil.  Edelman told Mr. Buscher that he wanted to address the situation directly with Garza Santos and Milmo Santos after Christmas.  By contrast, Mr. Buscher suggested that it would just be easier for Mr. Buscher to speak with Executive 3 at Supermajor to find out what was going on, but Edelman was against that idea.

264.   The following day, December 20, 2018, Edelman said that he did not want Mr. Buscher speaking with Supermajor again until he (Edelman) had a chance to speak with Garza Santos and Milmo Santos to find out what was going on.

COMPLAINT

265.   Meanwhile, Milmo Santos and Federico Gil from Perseus were pressuring Mr. Buscher to provide comments on the Redacted MOU.  Mr. Buscher declined to provide them with comments, since he was waiting for Edelman to have a conversation with Garza Santos and Milmo Santos.

266.   That same day, December 20, 2018, upon information and belief, Milmo Santos and Federico Gil simply went around Mr. Buscher and began communicating directly with Edelman.  They told Edelman that any redactions in the Redacted MOU were about matters specific only to Perseus, and were therefore of no concern to Lanius.

267.   Mr. Buscher believed Perseus' representations were false and that there were at least three critical and commercially valuable elements of the deal Mr. Buscher negotiated with Supermajor that were not in the Redacted MOU.  Mr. Buscher advised Edelman of this fact.

268.   Edelman, who told Mr. Buscher that he was tired of receiving harassing texts from Milmo Santos and Federico Gil, told Mr. Buscher that he was prepared to accept Perseus' representations that nothing important was taken out of the Formal MOU via the Redacted MOU, and that he wanted Mr. Buscher to provide his comments to Perseus on the Redacted MOU.

269.   On or about December 22, 2018, Mr. Buscher had a phone call with Andres Valezqez from Perseus.  Mr. Buscher asked Mr. Valezqez directly if the "missing" portions of the Redacted MOU pertained to just Perseus, or more broadly to Sirius, such that it impacted Lanius too.  Mr. Valezqez said he was sorry that this was happening, that he did not agree with it, but confirmed that he thought the "missing" portions of the Redacted MOU pertained generally to Sirius, and were not just Perseus-specific.

270.   Mr. Buscher reported this information to Edelman.  On or about December 23, 2018, Mr. Buscher and Edelman agreed that the proper way to handle the situation was to contact Supermajor about the fact that Perseus had

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

redacted the original draft of the Formal MOU sent by Supermajor, which it was not sharing with Lanius.

271.   On or about December 23, 2018, Mr. Buscher sent an email to Milmo Santos and Federico Gil.  In the email, Mr. Buscher reminded them that Perseus, Lanius, and Supermajor had all agreed that Supermajor would communicate the Formal MOU draft simultaneously to Perseus and Lanius.  Mr. Buscher expressed that Lanius did not want Supermajor to send the Formal MOU draft to Gil without Lanius being copied.  And Mr. Buscher said that he was to be copied on all future communications with Supermajor about the Formal MOU.

272.   On or about December 23, 2018, Mr. Buscher also sent an email to Executive 3 and Executive 4 at Supermajor (copying Milmo Santos) saying that he wanted to clear up any "misunderstanding."  Mr. Buscher said that Supermajor needed to send the draft of the Formal MOU directly to Milmo Santos and Mr. Buscher simultaneously, as Lanius has only seen a redacted version of the Formal MOU.  Mr. Buscher also stated that the Formal MOU should describe Sirius as a fully independent and standalone entity, jointly and equally owned by Lanius and Perseus.

273.   Later that day, on or about December 23, 2018, Milmo Santos called Mr. Buscher.  During that call, Milmo Santos screamed and yelled at Mr. Buscher for nearly 90 minutes.  Among other things, he was angry that Mr. Buscher had still not provided comments on the Redacted MOU.  In addition, Milmo Santos demanded to know why Mr. Buscher sent the email that day to Supermajor.

274.   In the days after, Perseus continued pushing Edelman and Mr. Buscher to provide Lanius comments on the Redacted MOU.

**M.     Mr. Buscher's Ongoing Efforts To Be Issued His Shares In Lanius**

275.   By December 2018, Mr. Buscher had been working on Mexican business ventures on behalf of the Joint Partnership for more than four years.  And since at least 2016, the structure for the Midstream Strategy had flowed through

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Sirius, which was equally owned by Perseus and Lanius. However, while Lanius owned half of Sirius (via the Sirius Shareholders Agreement), Mr. Buscher still had not been issued shares representing his equal ownership interest in Lanius.

276. As described more fully in Sect. I, *supra*, there were numerous communications between Mr. Buscher and Edelman and/or his representatives between April 2016 and December 2018 in which Edelman continued to promise that he would issue Mr. Buscher shares of Lanius.

277. By late 2018, the discussion had reached the point where Edelman was promising that Mr. Buscher would be issued his shares in Lanius once the two sides had agreed on an accounting for debts and credits for the seismic hammer, as well as all other Joint Partnership Expenses related to Ajax, Falcon, Canadian Quantum, American Quantum and Sirius, a concept that Mr. Buscher, Edelman, and Collett referred to as the "debt ladder."

278. On or about December 11, 2018, Mr. Buscher wrote by email to Edelman (via his representative Collett) to provide what Mr. Buscher viewed as the final accounting of Joint Partnership Expenses, since inception, for purposes of finalizing the "debt ladder," and in anticipation of being issues his shares of Lanius.

a. On or about December 11, 2018, Collett (on behalf of Edelman) wrote back to Mr. Buscher by email to say that he was ready to speak with Mr. Buscher about finalizing the "debt ladder" calculations.

b. On or about December 11, 2018, Mr. Buscher wrote to Edelman (via his representative Collett) by email to say he thought they were really close to getting everything set. Mr. Buscher attached a spreadsheet with Mr. Buscher's calculations about the Joint Partnership Expenses incurred since the Joint Partnership's inception.

c. This written exchange is further evidence of the fact that Edelman understood and acknowledged the terms of the Joint Partnership

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Agreement whereby Mr. Buscher was entitled to be issued shares of Lanius.

279.   On or about December 11, 2018, Mr. Buscher wrote by email to Edelman (via his representatives Collett, Polderman, and Ehr) to say that he and Collett had been talking, and that in the next two weeks everyone wanted to finalize the "debt ladder," issue Lanius share certificates to Mr. Buscher, appoint Mr. Buscher to Lanius' Board of Directors, and appoint Mr. Buscher to act as Vice Chairman and interim CFO of Sirius.

280.   But throughout these discussions in late 2018, Edelman continued to stall.  Edelman and Mr. Buscher had previously agreed, pursuant to the Joint Partnership Agreement, that Mr. Buscher would receive investment credit for the book value of his seismic hammer.  Edelman claimed that Mr. Buscher was trying to assign a book value to the seismic hammer that was too high.  Edelman told Mr. Buscher that he wanted an audit to be performed of American Quantum to confirm the seismic hammer's value.

281.   Mr. Buscher refused this request for two reasons.  First, he viewed it as a stalling tactic, rather than a good-faith dispute, and wanted Edelman to follow through on his commitments to issue the Lanius shares.  Second, Mr. Buscher pointed out to Edelman that Canadian Quantum, a public company, had already publicly stated the book value of the seismic hammer, using the same value that Mr. Buscher was utilizing.  The Canadian Quantum book valuation of the seismic hammer was vetted and approved by two different law firms and publicly announced to investors.

282.   In short, Mr. Buscher had been working with Edelman for more than one year to finalize the "debt ladder" so that he could be issued his shares in Lanius, but it never seemed to proceed because of endless requests from Edelman for more trivial information.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

283.   In truth, Edelman was just stringing Mr. Buscher along by continually promising to issue Mr. Buscher an ownership share of Lanius because he wanted Mr. Buscher to keep diligently working on the Sirius project with Supermajor.  But Edelman always manufactured some minor reason why he could not issue Mr. Buscher 50% of Lanius' shares, and in fact never did so.

284.   On or about December 11, 2018, Buscher flew to London to meet with Collett (on behalf of Edelman) to negotiate and determine the "debt ladder" numbers for the final time.

285.   On or about December 13, 2018, at Edelman's London office, Mr. Buscher and Collett (on behalf of Edelman) reached a final agreement on the "debt ladder."  This represented an agreement between Mr. Buscher and Edelman on how to assign a value to Mr. Buscher's share of the Joint Partnership Expenses, as well as the credit Mr. Buscher would be assigned for the value of the seismic hammer.

286.   After December 13, 2018, it did not appear to Mr. Buscher that there was any more impediment to him being issued 50% of Lanius shares.

287.   On or about January 3, 2019, Ehr, one of Edelman's representatives, suggested that Mr. Buscher and Edelman meet in London the following day to discuss Sirius.  Mr. Buscher agreed to go to London for the meeting.

288.   On or about January 4, 2019, Mr. Buscher was contacted by Polderman, who said that he wanted to speak with Mr. Buscher privately before Mr. Buscher's meeting with Edelman.  The two men met at the Westbury Hotel in London.

289.   At the meeting at the Westbury Hotel, on or about January 4, 2019, Polderman denied that Edelman had any business dealings (let alone a partnership) with Mr. Buscher, and said that Mr. Buscher would never be issued Lanius shares. Polderman said that Lanius was the property of Edelman's trust, and that Mr. Buscher would be "fired" if he did not start following the directives of Edelman's representatives, such as himself, Schurink, and Slabozsewcz.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

290.   Incredulous, Mr. Buscher told Polderman about the Joint Partnership Agreement, and the fact that he and Edelman had a binding contract and business partnership dating back to 2012.

    a.  Polderman (on Edelman's behalf) denied the existence of the Joint Partnership Agreement.  Polderman said that, at most, Mr. Buscher was an "employee" of the trusts owned by Delphine Ledain.

    b.  Polderman also instructed Mr. Buscher not to mention Edelman as having any involvement with the Joint Partnership's projects because Edelman had nothing to do with Delphine Ledain's assorted businesses.

    c.  In other words, Polderman tried to re-write history as if Mr. Buscher had been in business with Delpine Ledain for all of these years and that Edelman had nothing to do with it, which was patently absurd.

    d.  Mr. Buscher is in possession of thousands of text messages and emails with Edelman (through January 8, 2019) discussing Sirius, Lanius, and the Mexican Joint Venture.  There can be no question that Edelman, rather than Delphine Ledain, was Mr. Buscher's partner in the Sirius and Lanius ventures.

291.   After the meeting with Polderman at the Westbury Hotel, on or about January 4, 2019, Mr. Buscher sent an email to Executive 5, the in-house attorney of Supermajor, informing her that there was a conflict amongst Supermajor, Perseus, and Lanius regarding the Sirius deal, and that the process for further negotiations with Supermajor needed to be altered.

292.   On or about January 4, 2019, Executive 5 telephoned Mr. Buscher. During the call, Mr. Buscher explained how Lanius had received a Redacted MOU from Perseus, which he reminded Executive 5 was not in keeping with the agreement amongst Supermajor, Perseus, and Lanius that all Supermajor communications would go simultaneously to Perseus and Lanius.  Executive 5

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

agreed that something appeared wrong. She suggested a conference call amongst herself and Executive 3, Mr. Buscher, and Milmo Santos.

293. After Mr. Buscher's phone call with Executive 5, on or about January 4, 2019, Mr. Buscher proceeded to attend a meeting at Edelman's offices in London. There, he met with Polderman, Schurink, Slabozsewizc, Ehr, and Collett. Edelman did not participate in the meeting although he was scheduled to be there.

294. At this meeting at Edelman's offices, on or about January 4, 2019, Polderman arrived late and presented Mr. Buscher with a letter, signed by Volkert Struycken, who claimed to be the legal representative of Lanius, demanding that Mr. Buscher cease and desist any activities on behalf of Lanius. Mr. Buscher later learned that Struycken was a Dutch citizen who doubled as a part-time producer of B-grade movies in Hollywood of the type that Edelman's company, Atlantic Screen Productions, produces in Los Angeles.

295. Mr. Buscher told Polderman that he did not know Struycken and asked for evidence that Struycken was an authorized Lanius representative. Specifically, Mr. Buscher requested Struycken's contact information so he could call him. Polderman refused to provide Mr. Buscher with any information or give him Struycken's contact information. In fact, to date, Buscher has never been given a company name, address, or phone number for Struycken. All that Buscher has ever received is Struycken's icloud email address.

296. Later that day, on or about January 4, 2019, Mr. Buscher sent Executive 5 (the Supermajor in-house attorney) an email, attaching a copy of the Redacted MOU.

297. Within one hour of sending that email, on or about January 4, 2019, Mr. Buscher's access to the Sirius document and email servers was eliminated by Perseus, and all of his Sirius emails were erased off his computer.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

298.   On or about January 7, 2019, Mr. Buscher telephoned Executive 3 at Supermajor on his office line.  Executive 3 agreed that there seemed to be issues going on with Sirius, Perseus, and Lanius, but thought they could all be fixed.

299.   On or about January 7, 2019, Mr. Buscher had written communications with Edelman via text.  In those communications, Edelman confirmed that Mr. Buscher owned a percentage share of Lanius (and by extension, Sirius).  So even as late as January 7, 2019, Edelman was still behaving and conducting himself in correspondence with Mr. Buscher as if Mr. Buscher owned a share of Lanius.

300.   After January 8, 2019, Edelman refused to take any calls from Mr. Buscher.  Mr. Buscher's only point of contact with Edelman was through Polderman, who continued to insist that Mr. Buscher had no economic interest in Sirius and that Edelman was not involved in Lanius' business.  From this time forward, Polderman repeatedly told Mr. Buscher to not mention Edelman and only refer to Edelman's trust when discussing Lanius or Sirius.

301.   From on or about January 4, 2019 to the present, Edelman has steadfastly refused to honor his obligations pursuant to the May 9 Meeting, the Joint Partnership Agreement, or the many written communications described herein.  Edelman has taken the position that Mr. Buscher has no ownership interest in Sirius, has taken every effort to deny his ownership interest in Lanius, and has not issued 50% of Lanius' shares to Mr. Buscher.

302.   At the time of these events, Mr. Buscher held the titles of Vice Chairman and Interim Chief Financial Officer of Sirius.  Since that time, Edelman has refused to acknowledge any ownership interest in Sirius by Mr. Buscher, and Garza Santos and Milmo Santos warned Mr. Buscher not to attempt to involve himself in Sirius business.  They have excluded him from any meetings with Supermajor, refused to send or provide him with any information about the status of the Formal MOU with Supermajor and/or the progress in implementing the Midstream Strategy that Mr. Buscher created, removed Mr. Buscher from his

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

positions as Vice Chairman and Interim CFO of Sirius, and eliminated Mr. Buscher's access to Sirius emails, documents, or corporate records.

**N.    Since Their Rift, Edelman Has Abandoned His Obligations Under The Joint Partnership Agreement**

303.   Edelman has refused to speak or communicate with Mr. Buscher since January 8, 2019.  Since then, Mr. Buscher has tried to operate the Joint Partnership's various business enterprises, while Edelman continually breaches his obligations under the Joint Partnership Agreement.

**American Quantum**

304.   In or about February 2019, Mr. Buscher communicated to Edelman's representatives his intention to hold a shareholders meeting of American Quantum on March 1, 2019.  Mr. Buscher (through his company Ozero LLC) and Edelman (through his company Lang) each owned 50% of American Quantum.

305.   On or about March 1, 2019, Mr. Buscher held the shareholders meeting of American Quantum in Snowbird, Utah.  No representative from Lang attended the meeting, although they were invited to do so, in person or telephonically, by Mr. Buscher, in his capacity as director for American Quantum.

306.   Mr. Buscher informed Edelman (via his representative Collett) that American Quantum did not have sufficient funds to continue operations if Edelman did not honor his obligations under the Joint Partnership Agreement and contribute financing to the company.

307.   By that time, Edelman had not paid any Joint Partnership expenses related to American Quantum since November 2018.

308.   As a result of Edelman's breach of the Joint Partnership Agreement, including but not limited to his refusal to financially contribute to American Quantum, Mr. Buscher has incurred and paid tens of thousands of dollars in operating expenses related to American Quantum.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

309.   But pursuant to the Joint Partnership Agreement, Edelman must advance the payment of all expenses for American Quantum, and pursuant to partnership law, Edelman is jointly and equally responsible for paying those expenses.  Instead, Mr. Buscher had paid these expenses, thereby honoring his commitments under the Joint Partnership Agreement, and to maintain the value of American Quantum for the benefit of the Joint Partnership.

### Shares In Joint Entities Have Not Been Issued To Mr. Buscher

310.   To date, Edelman has not issued Mr. Buscher 50% of the shares in Lang, as he was required to do pursuant to the promises made at the May 9 Meeting, in the Joint Partnership Agreement, and in subsequent writings, including but not limited to, drafts of the Lang Shareholder Agreement.

311.   To date, Edelman has not issued Mr. Buscher 50% of the shares in Lanius, as he was required to do pursuant to the promises made at the May 9 Meeting, in the Joint Partnership Agreement, and in subsequent writings, including but not limited to, drafts of the Lanius Shareholder Agreement.

312.   Since November 2018, Mr. Buscher has not been paid his Living Expenses Advance by Edelman.

313.   Since January 2019, Mr. Buscher has been removed from any involvement with Sirius.  He has been stripped of his officer titles at Sirius, divested of any access to Sirius documents or email server (including his own Sirius email account), removed from any communications about Sirius, and denied financial or information about the Sirius' project with Supermajor in Mexico.  Mr. Buscher is not publicly identified as an owner of Sirius, even though, pursuant to the Joint Partnership Agreement, he is a 25% owner of Sirius.

///

///

///

///

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# FIRST CAUSE OF ACTION
## [Breach of Oral Contract]
## (Against Defendant Douglas Edelman)

314.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 313.

315.   This is a cause of action for breach of oral contract.

316.   On or about May 9, 2012, Mr. Buscher and Edelman entered into an oral contract, identified herein as the Joint Partnership Agreement.

317.   On May 9, 2012, Mr. Buscher and Edelman met at the Beverly Plaza Hotel in Los Angeles.  At that meeting, they agreed to form a Joint Partnership to explore opportunities to invest in the oil and gas industry.  At the May 9 Meeting, Mr. Buscher and Edelman agreed on terms for the Joint Partnership Agreement.

318.   Under the terms of the Joint Partnership Agreement, Mr. Buscher agreed to do the following:

    a. Resign from his executive positions at Sistema OJSC and Navitas Global Resources, Ltd.;

    b. Utilize all of his time, resources, and professional knowledge, experience, and contacts to identify oil and gas business opportunities for the benefit of the Joint Partnership; and

    c. Transfer his proprietary rights in the seismic hammer to a Joint Entity owned by the Joint Partnership.

319.   Under the terms of the Joint Partnership Agreement, Edelman agreed to do the following:

    a. Contribute all up-front money for the Joint Partnership to invest in business opportunities in the oil and gas industry;

    b. Pay Mr. Buscher a monthly Living Expenses Advance, which would be accounted for as a Joint Partnership Expense to be borne equally by Mr. Buscher and Edelman, meaning Mr. Buscher was financially

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

responsible for repaying his 50% share of the Living Expenses
Advance before taking any distribution from the Joint Partnership; and

   c.  Ensure that Mr. Buscher received a 50% interest in any Joint Entity
used by the Joint Partnership.

320. Under the terms of the Joint Partnership Agreement, Mr. Buscher and Edelman agreed that all business opportunities pursued by the Joint Partnership would be equally owned by Mr. Buscher and Edelman, and specifically:

   a.  The Joint Partnership would form one or more Joint Entity as a
corporate vehicle to pursue any business opportunity on behalf of the
Joint Partnership;

   b.  Mr. Buscher would own 50% of the shares of any Joint Entity, and
Edelman would own the other 50% of the shares of any Joint Entity;

   c.  Edelman would advance any monies invested by the Joint Partnership
to pursue any business opportunity (either as an equity investment in a
business venture or expenses incurred that were reasonable related to a
business venture), i.e., the Joint Partnership Expenses;

   d.  Mr. Buscher and Edelman would each be financially responsible for
paying 50% of the Joint Partnership Expenses from the Joint
Partnership's total profits;

   e.  Mr. Buscher and Edelman would keep a running accounting of all
Joint Partnership Expenses;

   f.  Mr. Buscher would be responsible for paying 50% of all Joint
Partnership Expenses, from the Joint Partnership's total profits, before
he would receive any distribution of proceeds from the Joint
Partnership's business ventures; and

   g.  After paying for his 50% share of the Joint Partnership Expenses, Mr.
Buscher was entitled to 50% of all proceeds earned from the Joint
Partnership's business ventures.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

321.   In reliance on Edelman's promises at the May 9 Meeting and in the Joint Partnership Agreement, Mr. Buscher resigned from his executive positions at Sistema and Navitas.

322.   In reliance on Edelman's promises at the May 9 Meeting and in the Joint Partnership Agreement, Mr. Buscher spent all of his professional time, efforts, and energy from 2012 through January 8, 2019, pursuing business opportunities on behalf of the Joint Partnership, including but not limited to, four years (from 2014 to the end of 2018) working on the Midstream Strategy in Mexico that ultimately became Sirius.

323.   As performance of his obligations under the Joint Partnership Agreement, Mr. Buscher identified business opportunities that the Joint Partnership invested in, including but not limited to, Falcon Petroleum Ltd., Canadian Quantum, American Quantum, Kaban Energia, and Sirius Energy SA de CV.

324.   Accordingly, Mr. Buscher performed his obligations pursuant to the Joint Partnership Agreement, and is entitled to 50% of the proceeds earned by any business venture pursued by the Joint Partnership.

325.   Edelman breached the Joint Partnership Agreement when, between January 4 and January 8, 2019, he informed Mr. Buscher that he would not issue 50% of the shares of Lanius to Mr. Buscher and denied that the Joint Partnership Agreement was valid or enforceable.

326.   Lanius, in turn, owned 50% of Sirius, a business that is now involved in a valuable business relationship with Supermajor (thanks to Mr. Buscher's efforts).  By refusing to issue Mr. Buscher his contractually-agreed 50% ownership of Lanius, Edelman also denied Mr. Buscher his contractually-agreed distribution of any proceeds from Sirius.

327.   Edelman has further breached the Joint Partnership Agreement by refusing to disclose to his partner, Mr. Buscher, the status of Lanius' investment in

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

1  Sirius, or to provide an accounting of the Sirius project, or otherwise keep Mr.

2  Buscher appraised of the activities of Lanius or Sirius.

3      328.   Mr. Buscher has been damaged by Edelman's breach of the Joint

4  Partnership Agreement as follows.  <u>First</u>, since November 2018, he has not received

5  the Living Expenses Advance that Edelman agreed to pay him.  <u>Second</u>, he has

6  personally paid Joint Partnership Expenses related to American Quantum and other

7  Joint Entities, for which Edelman has not repaid him.  <u>Third</u>, he has not received

8  the 50% share ownership of Lang or Lanius promised to him by Edelman.  <u>Fourth</u>,

9  Edelman is fraudulently withholding disclosure of Mr. Buscher as a valid 25%

10  owner in Sirius, thereby damaging his reputation.  <u>Fifth</u>, Edelman instructed

11  Slabozsewicz to inform Supermajor that Buscher had upset Perseus and was

12  reassigned to a different venture in Edelman's business portfolio, thus maligning

13  Mr. Buscher while still seeking to benefit from Mr. Buscher's professional

14  credentials by portraying him as still part of Edelman's group.

15      329.   The Joint Partnership Agreement is an enforceable oral contract.

16      330.   Moreover, as described more fully herein, there are numerous written

17  notes and memoranda between Edelman and Mr. Buscher that evidence the fact that

18  they formed a contract, and that at all times before the date of Edelman's breach,

19  that they conducted themselves as being governed by terms of the Joint Partnership

20  Agreement.

21  **<u>SECOND CAUSE OF ACTION</u>**
**(Breach of Implied-In-Fact Contract)**
**[Against Defendant Douglas Edelman]**

22

23

24      331.   Plaintiff hereby incorporates, as though fully set forth herein, the

25  allegations contained in paragraphs 1 through 330.

26      332.   This is a cause of action for breach of an implied-in-fact contract.

27

28

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

333.   On or about May 9, 2012, Mr. Buscher and Edelman entered into a contract, identified as the Joint Partnership Agreement, and with the terms as described more fully herein.

334.   In reliance on Edelman's promises in the Joint Partnership Agreement, Mr. Buscher resigned from his executive positions at Sistema and Navitas.

335.   In reliance on Edelman's promises in the Joint Partnership Agreement, Mr. Buscher spent all of his professional time, efforts, and energy from 2012 through January 8, 2019, pursuing business opportunities on behalf of the Joint Partnership.

336.   As performance of his obligations under the Joint Partnership Agreement, Mr. Buscher identified business opportunities that the Joint Partnership invested in, including but not limited to, Falcon Petroleum Ltd., Canadian Quantum, American Quantum, Kaban Energia, and Sirius Energy SA de CV.

337.   Accordingly, Mr. Buscher performed his obligations pursuant to the Joint Partnership Agreement, and is entitled to 50% of the proceeds earned any business venture pursued by the Joint Partnership.

338.   Edelman breached the Joint Partnership Agreement when, between January 4 and January 8, 2019, he informed Mr. Buscher that he would not issue 50% of the shares of Lanius to Mr. Buscher and denied that the Joint Partnership Agreement was valid or enforceable.

339.   Lanius, in turn, owned 50% of Sirius, a business that is now involved in a valuable business relationship with Supermajor (thanks to Mr. Buscher's efforts).  By refusing to issue Mr. Buscher his contractually-agreed 50% ownership of Lanius, Edelman also denied Mr. Buscher his contractually-agreed distribution of any proceeds from Sirius.

340.   Edelman has further breached the Joint Partnership Agreement by refusing to disclose to his partner, Mr. Buscher, the status of Lanius' investment in

1  Sirius, or to provide an accounting of the Sirius project, or otherwise keep Mr.

2  Buscher appraised of the activities of Lanius or Sirius.

3  341.  Mr. Buscher has been damaged by Edelman's breach of the Joint

4  Partnership Agreement as follows.  First, since November 2018, he has not received

5  the Living Expenses Advance that Edelman agreed to pay him.  Second, he has

6  personally paid Joint Partnership Expenses related to American Quantum and other

7  Joint Entities, for which Edelman has not repaid him.  Third, he has not received

8  the 50% share ownership of Lang or Lanius promised to him by Edelman.  Fourth,

9  Edelman is fraudulently withholding disclosure of Mr. Buscher as a valid 25%

10  owner in Sirius, thereby damaging his reputation.  Fifth, Edelman instructed

11  Slabozsewicz to inform Supermajor that Buscher had upset Perseus and was

12  reassigned to a different venture in Edelman's business portfolio, thus maligning

13  Mr. Buscher while still seeking to benefit from Mr. Buscher's professional

14  credentials by portraying him as still part of Edelman's group.

15  342.  The Joint Partnership Agreement is an enforceable implied-in-fact

16  contract.

17  343.  Mr. Buscher and Edelman have manifested the existence and terms of

18  the Joint Partnership Agreement, including, but not limited to, the fact that:

19      a.  Mr. Buscher sent Edelman a term sheet in or about November 2012

20         outlining the terms of the Joint Partnership Agreement, and Edelman

21         wrote back that he agreed to those terms.  From November 2012 to

22         January 8, 2019, both Edelman and Mr. Buscher acted towards each

23         other in accordance with those terms;

24      b.  Edelman paid Mr. Buscher's Living Expenses Advance from 2013

25         until November 2018, in accordance with the terms of the Joint

26         Partnership Agreement;

27      c.  Edelman, both personally and through his representatives, sent

28         numerous written communications to Mr. Buscher between 2014 and

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

December 2018 indicating that he would issue Mr. Buscher a 50%
interest in the Joint Entity corporate vehicles that were being used to
conduct the Joint Partnership's business activities (*e.g.*, Lang and
Lanius), as described more fully herein; and

d. Edelman, both personally and through his representatives, negotiated
with Mr. Buscher on many occasions between 2012 and December
2018 the amount and composition of all Joint Partnership Expenses so
that Mr. Buscher's 50% allocation of those Joint Partnership Expenses
could be calculated, which was a term of the Joint Partnership
Agreement.

344.   Through their written communications and conduct between the Joint
Partnership's inception in May 2012 and January 8, 2019, Edelman and Mr.
Buscher have behaved towards each other like counterparties to a contractual
agreement.

345.   The conduct of Mr. Buscher and Edelman was intentional towards
each other, and each of them knew, or had reason to know, that the other would
interpret the conduct as an agreement to enter into a contract.  Accordingly, the
Joint Partnership Agreement may be enforced as an implied-in-fact contract.

### THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### [Against Defendant Douglas Edelman]

346.   Plaintiff hereby incorporates, as though fully set forth herein, the
allegations contained in paragraphs 1 through 345.

347.   This is a cause of action for breach of the implied covenant of good
faith and fair dealing.

348.   In every contract or agreement there is an implied promise of good
faith and fair dealing, meaning that each party to the contract will not do anything
to unfairly interfere with the right of any other party to receive the benefits of the

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

contract. This is particularly true, and has been repeatedly upheld, when it comes to the conduct of business or joint venture partners.

349.   As described more fully herein, Mr. Buscher and Edelman entered into a contract, described herein as the Joint Partnership Agreement.

350.   As described more fully herein, Mr. Buscher performed all, or substantially all, of the things required of him by the terms of the Joint Partnership Agreement.

351.   Edelman was in a position to perform his obligations under the Joint Partnership Agreement, including but not limited to: (i) issuing Mr. Buscher his 50% ownership share of Lang; (ii) issuing Mr. Buscher his 50% ownership share of Lanius; (iii) paying Mr. Buscher' Living Expenses Advance; and (iv) not conspiring to strip Mr. Buscher of his involvement with Lanius and Sirius and/or to keep Mr. Buscher in the dark about the activities of Lanius and Sirius.

352.   Edelman unfairly interfered with Mr. Buscher's right to receive the benefits of the contract known as the Joint Partnership Agreement. Specifically, Edelman: (i) has not issued Mr. Buscher a 50% ownership of Lang; (ii) has not issued Mr. Buscher a 50% ownership of Lanius; (iii) has not paid Mr. Buscher his Living Expenses Advance since November 2018; and (iv) conspired to strip Mr. Buscher of his titles at Sirius and access to any information about Sirius.

353.   Mr. Buscher was harmed by Edelman's conduct as he does not fully enjoy the value of a 50% ownership interest in Lang or Lanius (which would, by extension, grant him a 25% ownership interest in Sirius), has not received a Living Expenses Advance since November 2018, has personally incurred costs to maintain the Joint Partnership's assets in good condition, and was removed from all involvement with Sirius and/or its deal with Supermajor.

///

///

///

COMPLAINT

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# FOURTH CAUSE OF ACTION
## (Breach of Fiduciary Duty)
### [Against Defendant Douglas Edelman]

354.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 353.

355.   This is a cause of action for breach of fiduciary duty.

356.   Business partners owe a fiduciary duty to one another that imposes a duty on a business partner a duty to act with the utmost good faith in the best interest of their business partner.

357.   Mr. Buscher and Edelman formed a business partnership when they entered into the Joint Partnership Agreement and began jointly exploring oil and gas business opportunities around the world between 2012 and early 2019.

358.   From the time they entered into the Joint Partnership Agreement, Edelman had a duty to act in the utmost good faith, and in the best interest, of Mr. Buscher.

359.   Instead, Edelman has breached his fiduciary duties to Mr. Buscher as follows:

   a.   Edelman has refused to honor his commitments to treat Mr. Buscher as an equal partner in the Joint Partnership;

   b.   Edelman has refused to issue to Mr. Buscher 50% of the shares of Lang, as required by the Joint Partnership Agreement;

   c.   Edelman has refused to issue to Mr. Buscher 50% of the shares of Lanius, as required by the Joint Partnership Agreement

   d.   Edelman has refused to pay Mr. Buscher's Living Expenses Advance since November 2018;

   e.   Edelman has refused to include Mr. Buscher in any of the activities of Sirius since January 8, 2019, despite the fact that it was Mr. Buscher who identified the Sirius opportunity, provided the technical and

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

industry know-how to turn Sirius into a profitable venture, and created the business opportunity for Sirius to pursue the Midstream Strategy with Supermajor;

    f.  Edelman has refused to provide Mr. Buscher with any information about the Sirius project with Supermajor, conspired to strip Mr. Buscher of his titles as Vice Chairman and CFO of Sirius, agreed that Mr. Buscher's access to the Sirius database and his Sirius emails should be eliminated, and provided no accounting or other financial information to Mr. Buscher regarding Sirius.

360.  In so doing, Edelman has actively worked against the interests of his partner, Mr. Buscher.

361.  Mr. Buscher did not consent to Edelman's conduct that breached the fiduciary duty.

362.  Mr. Buscher has incurred damages from Edelman's breach of fiduciary duty as he does not fully enjoy the value of a 50% ownership interest in Lang or Lanius (which would, by extension, grant him a 25% ownership interest in Sirius), has not received a Living Expenses Advance since November 2018, has personally incurred costs to maintain the Joint Partnership's assets in good condition, and was removed from all involvement with Sirius and/or its deal with Supermajor.

363.  Edelman's conduct was a substantial factor in Mr. Buscher's damages. In fact, Edelman is wholly responsible for those damages through his conduct.

## FIFTH CAUSE OF ACTION
### (Deceit or Intentional Fraud)
### [Against Defendant Douglas Edelman]

364.  Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 363.

365.  This is a cause of action for deceit or intentional fraud.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

366.   Edelman made misrepresentations to Mr. Buscher at the May 9 Meeting.  Specifically:

    a.   Edelman promised that if Mr. Buscher resigned from his jobs at Sistema and Navitas, devoted all of his time and efforts to the Joint Partnership, and signed over his proprietary rights to the seismic hammer, that Edelman would make Mr. Buscher a 50-50 partner in all of the Joint Partnership's business ventures.

    b.   Edelman also promised that Mr. Buscher would be entitled to 50% ownership of any Joint Entity that the Joint Partnership formed to pursue its business opportunities.

    c.   Edelman further promised that Mr. Buscher would be entitled to 50% of any proceeds earned by the Joint Partnership (after paying his share of the Joint Partnership Expenses).

367.   Edelman never intended to honor the promises he made to Mr. Buscher at the May 9 Meeting, or thereafter, and has not done so.

368.   From 2012 through January 8, 2019, as described more fully herein, Edelman made subsequent statements and promises to Mr. Buscher to string him along and get him to continue working on projects that Edelman wanted to profit from.  These include, but are not limited to:

    a.   Edelman's November 3, 2012, written communication to Mr. Buscher agreeing to the term sheet that Mr. Buscher had sent him, and most specifically, confirming that Mr. Buscher's company would be an "equal investment participant" with Edelman in the Joint Partnership's business ventures.

    b.   As described more fully herein, the February 2014 correspondence between Mr. Buscher and Edelman and/or his representatives to negotiate that Mr. Buscher and Edelman would each own 50% of

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Ajax, a Joint Entity used by the Joint Partnership to invest in business opportunities such as Falcon.

c.   As described more fully herein, the correspondence on or about April 7, 2014, and May 6, 2014, between Mr. Buscher and Edelman and/or his representatives that Mr. Buscher was entitled to a 50% ownership stake of Lang, and that Edelman would issue him that stake.

d.   As described more fully herein, the correspondence on or about July 8, 2016, July 11, 2016, November 21-22, 2016, December 7, 2016, March 17, 2017, April 27-28, 2017, May 25, 2018, November 28, 2018, and January 7-8, 2019, between Mr. Buscher and Edelman and/or his representatives that Mr. Buscher was entitled to a 50% ownership stake of Lanius, and that Edelman would issue him that stake.

369.   Edelman knew that he did not intend to honor his various promises to Mr. Buscher, in the Joint Partnership Agreement and otherwise, to issue Mr. Buscher a 50% ownership interest in Lang, Lanius, or other Joint Entities, or to otherwise treat Mr. Buscher as a true partner in Lanius (and by extension, in the Sirius enterprise).

370.   Edelman acted with intent to defraud Mr. Buscher.  He convinced Mr. Buscher to quit his jobs, abandon his successful career, and devote all of his energies to scouring the world for lucrative business opportunities.  Then, when Mr. Buscher found a fantastic business opportunity in Mexico and spearhead the effort that turned that opportunity into an actual business arrangement with Supermajor, Edelman cut him out.  At no time did Edelman intend to follow through on his promises, on which Mr. Buscher detrimentally relied, to make Mr. Buscher a true partner and issue him a 50% ownership interest in Lang, Lanius or other Joint Entities utilized by the Joint Partnership to pursue business ventures.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

371.   Mr. Buscher was reasonable and justified in relying on Edelman's promises.  Before entering into various promises and commitments at the May 9 Meeting and thereafter, Mr. Buscher had known Edelman for nearly 20 years.  They had worked on business matters together and even owned a vacation property together.  They were not strangers to each other.  Mr. Buscher was justified in relying on Edelman's promises to make him a true 50-50 partner in all of their business ventures.  And in reliance on those promises, Mr. Buscher quit his jobs, abandoned his successful career, and devoted all of his time and energy into looking for business opportunities for himself and Edelman.

372.   Mr. Buscher has incurred damages from Edelman's fraudulent conduct as he does not fully enjoy the value of a 50% ownership interest in Lang or Lanius (which would, by extension, grant him a 25% ownership interest in Sirius), has not received a Living Expenses Advance since November 2018, has personally incurred costs to maintain the Joint Partnership's assets in good condition, and was removed from all involvement with Sirius and/or its deal with Supermajor.

373.   Edelman's conduct, through his fraudulent and deceitful promises to Mr. Buscher at the May 9 Meeting and thereafter, coupled with stringing Mr. Buscher along for six years without ever fulfilling his promises to make Mr. Buscher a full partner, was a substantial factor in Mr. Buscher's damages.

374.   Edelman intentionally induced Mr. Buscher to quit his jobs, abandon his career, and devote all of his time to finding business opportunities, with the promise that they would share equally in any profits.  Then, when Mr. Buscher identified, cultivated, and "sold" a fantastic business opportunity, Edelman responded by immediately cutting Mr. Buscher out and pretending as if they were never partners and that Mr. Buscher was entitled to nothing.  Edelman acted with oppression, fraud, and malice towards Mr. Buscher, and engaged in despicable conduct that subjected Mr. Buscher to cruel and unjust hardship in conscious

COMPLAINT

1  disregard of Mr. Buscher's rights, so as to justify an award of punitive and
2  exemplary damages.

### SIXTH CAUSE OF ACTION
### (Promissory Fraud)
### [Against Defendant Douglas Edelman]

375.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 374.

376.   This is a cause of action for promissory fraud.

377.   Edelman made misrepresentations to Mr. Buscher at the May 9 Meeting, and thereafter, as described more fully in the Fifth Cause of Action.

378.   Edelman made these promises to Mr. Buscher with the intent to deceive Mr. Buscher and/or with the intent to induce Mr. Buscher to enter into, and perform pursuant to, the Joint Partnership Agreement.

379.   Relying on those promises, Mr. Buscher quit his jobs, abandoned his successful career, devoted all his energies to scouring the world for lucrative opportunities for the Joint Partnership, found a fantastic opportunity in Mexico, and spearheaded the effort that turned that opportunity into an actual business arrangement with Supermajor.

380.   Edelman never intended to honor the promises he made to Mr. Buscher at the May 9 Meeting, in the Joint Partnership, or thereafter, and has not done so.

381.   Mr. Buscher has incurred damages from Edelman's fraudulent conduct as he does not fully enjoy the value of a 50% ownership interest in Lang or Lanius (which would, by extension, grant him a 25% ownership interest in Sirius), has not received a Living Expenses Advance since November 2018, has personally incurred costs to maintain the Joint Partnership's assets in good condition, and was removed from all involvement with Sirius and/or its deal with Supermajor.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

382.   Edelman intentionally induced Mr. Buscher to quit his jobs, abandon his career, and devote all of his time to finding business opportunities for him Edelman to invest in, with the promise that they would share equally in any profits. Then, when Mr. Buscher identified, cultivated, and "sold" a fantastic business opportunity, Edelman responded by immediately cutting Mr. Buscher out and pretending as if they were never partners and that Mr. Buscher was entitled to nothing.  Edelman acted with oppression, fraud, and malice towards Mr. Buscher, and engaged in despicable conduct that subjected Mr. Buscher to cruel and unjust hardship in conscious disregard of Mr. Buscher's rights, so as to justify an award of punitive and exemplary damages.

## SEVENTH CAUSE OF ACTION
### (California Business & Professions Code Sect. 17200 *et seq.*)
### [Against Defendant Douglas Edelman]

383.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 382.

384.   This is a cause of action for violation of California's Unfair Competition Law, codified as California Business & Professions Code §§ 17200 *et seq*.

385.   Edelman's conduct, as described herein, constitutes unlawful, unfair, or fraudulent business acts or practices.

386.   As described more fully in the Fifth and Sixth Causes of Action, Edelman's conduct towards Mr. Buscher was fraudulent in that he made promises to Mr. Buscher that he did not intend to honor (and has not honored) but that Mr. Buscher justifiably and detrimentally relied on.

387.   Moreover, as described more fully herein, Edelman's conduct was an unfair business practice towards Mr. Buscher.  The harm to Mr. Buscher far outweighed the utility of Edelman's conduct.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

388.   By reason of Edelman's fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, Edelman has violated California Business and Professions Code Section 17200 *et seq*. by consummating an unlawful, unfair, and fraudulent business practice, designed to deprive Mr. Buscher of his ownership of Lang, Lanius (and by extension Sirius), or any other Joint Entity, and to any other benefits Mr. Buscher is entitled to from the Joint Partnership.

389.   By reason of the foregoing, Mr. Buscher has suffered and continues to suffer damages.

### EIGHTH CAUSE OF ACTION
### (Conversion)
### [Against Defendant Douglas Edelman]

390.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 389.

391.   This is a cause of action for conversion.

392.   Mr. Buscher owned, possessed, or had the right to possess all of the rights and benefits granted to him under the Joint Partnership with Edelman by the Joint Partnership Agreement (hereafter, the "Property").

393.   Edelman has intentionally and substantially interfered with, and wrongfully exercised control over, Mr. Buscher's Property by taking possession of the Property, preventing Mr. Buscher from having access to the Property, and refusing to return the Property (in the form of issuing 50% share ownership of Lang or Lanius) when Mr. Buscher demanded it.

394.   Mr. Buscher did not consent to Edelman's conduct in interfering with and/or wrongfully exercising control over the Property.

395.   By reason of the foregoing, Mr. Buscher was harmed by Edelman's interference with, and wrongful control over, the Property.

396.   Edelman's conduct was a substantial factor in Mr. Buscher's harm.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment)
### [Against Defendant Douglas Edelman]

397.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 396.

398.   This is a cause of action for unjust enrichment.

399.   Through his fraudulent and unfair conduct, as described more fully herein, Edelman has received all the benefits of the Joint Partnership, including but not limited to, ownership of Lanius (and by extension 50% ownership of Sirius).

400.   Meanwhile, Edelman has deprived Mr. Buscher of his rights to receive those same benefits.  Instead, Edelman has received and retained those benefits at Mr. Buscher's expense.

401.   Mr. Buscher is entitled to all of his rights and benefits under the Joint Partnership Agreement, specifically, 50% ownership of Lang and 50% ownership of Lanius (and by extension 25% ownership of Sirius), but does not currently have those benefits because Edelman has deprived him of those benefits.

402.   Accordingly, to the extent the Joint Partnership Agreement is void or rescinded by Edelman's fraud and conversion, Mr. Buscher is entitled to restitution from Edelman in the form of 50% ownership of Lanius (and by extension 25% ownership of Sirius).

## TENTH CAUSE OF ACTION
### (Money Had and Received)
### [Against Defendant Douglas Edelman]

403.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 402.

404.   This is a cause of action for money had and received.

405.   Through his conduct, Edelman has received the benefits of the Sirius business opportunity, while depriving Mr. Buscher of his legal right to share

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

equally in those benefits.  In this regard, Edelman has received money and other benefits that were meant to go equally to him and Mr. Buscher.

406.   These benefits and/or money did not go to Mr. Buscher as they should have.

407.   Edelman has not bestowed these benefits or money on Mr. Buscher, who has suffered damages as a result.

## ELEVENTH CAUSE OF ACTION
### (Intentional Interference with Contractual Relations)
### [Against Defendant Douglas Edelman]

408.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 407.

409.   This is a cause of action for intentional interference with contractual relations.

410.   Mr. Buscher entered into the Mexican Joint Venture with Garza Santos, Milmo Santos, and Edelman.

411.   Pursuant to the Mexican Joint Venture, Garza Santos, Milmo Santos, Edelman, and Mr. Buscher agreed that each would own 25% of any business venture that they jointly developed related to the Midstream Strategy in Mexico.

412.   Pursuant to that agreement, Mr. Buscher spent four years in Mexico, assiduously working to turn the Midstream Strategy into a viable business opportunity.  This culminated in the Final MOU and the joint exploration of the Midstream Strategy by Sirius and Supermajor.

413.   Pursuant to the Joint Partnership Agreement, Mr. Buscher is a 50% owner of Lanius.

414.   Pursuant to the Sirius Shareholder Agreement, Mr. Buscher is a 25% owner of Sirius.  In this way, Mr. Buscher had a valid contract with a third party, in this case, Perseus and/or Sirius.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

415.    Pursuant to the Final MOU, Mr. Buscher is a beneficiary of Sirius' current business relationship with Supermajor (hereafter, the "Supermajor Contracts").  In this way, Mr. Buscher had a valid contract (through his ownership interest of Sirius) with a third party, in this case, Supermajor.

416.    Edelman knew of the Joint Partnership Agreement, the Sirius Shareholder Agreement, and the Supermajor Contracts.  And he knew that Mr. Buscher had rights under all of those agreements.

417.    By conspiring with Garza Santos and Milmo Santos to exclude Sirius from all activities (including continued work with Supermajor under the Supermajor Contracts), Edelman prevented performance of the Sirius Shareholder Agreement and Supermajor Contracts, or made performance of those agreements more expensive or difficult.

418.    Edelman intended to disrupt performance of the Sirius Shareholder Agreement and/or the Supermajor Contracts, or knew that disruption was substantially certain to occur.

419.    Performance of the Sirius Shareholder Agreement and/or Supermajor Contracts was disrupted by Edelman's intentional conduct.

420.    Mr. Buscher was harmed by Edelman's tortious conduct.

421.    Edelman's conduct, as described more fully herein, was a substantial factor in causing Mr. Buscher's harm.

## TWELFTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Advantage)
### [Against Defendant Douglas Edelman]

422.    Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 421.

423.    This is a cause of action for intentional interference with prospective economic advantage.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

424.  Mr. Buscher was in an economic relationship with Garza Santos and Milmo Santos (through their company Perseus) that probably would have resulted in an economic benefit to Mr. Buscher.

425.  Mr. Buscher was in an economic relationship with Sirius that probably would have resulted in an economic benefit to Mr. Buscher.

426.  Mr. Buscher was also in an economic relationship with Supermajor that probably would have resulted in an economic benefit to Mr. Buscher.

427.  Edelman knew of Mr. Buscher's economic relationships with Perseus, Sirius, and Supermajor.

428.  Edelman engaged in wrongful conduct, as described more fully herein.

429.  By engaging in this wrongful conduct, Edelman intended to disrupt Mr. Buscher's economic relationship with Perseus, Sirius, and/or Supermajor, or Edelman knew that disruption of these economic relationships was certain or substantially certain to occur.

430.  Mr. Buscher's economic relationships with Perseus, Sirius, and Supermajor were disrupted.  In fact, Mr. Buscher has had no contact with Perseus, Sirius, or Supermajor since January 8, 2019.  He was stripped of his titles in Sirius, removed from Sirius' email server and document database, and excluded from any information about the activities of Sirius in connection with Supermajor.  Edelman was the cause of all this disruption.

431.  Mr. Buscher was harmed by the disruption of his economic relationships with Perseus, Sirius, and Supermajor, as described more fully herein.

432.  Edelman's conduct was a substantial factor in causing Mr. Buscher's harm, as described more fully herein.

///
///
///
///

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### THIRTEENTH CAUSE OF ACTION
### (Declaratory Relief)
### [Against Defendant Douglas Edelman]

433.   Plaintiff hereby incorporates, as though fully set forth herein, the allegations contained in paragraphs 1 through 432.

434.   This is a cause of action for declaratory relief.

435.   An actual controversy has arisen and now exists between the parties concerning the following matters:

    a.  Edelman's breach of the Joint Partnership Agreement;

    b.  Edelman's refusal to issue 50% of the shares of Lang to Mr. Buscher;

    c.  Edelman's refusal to issue 50% of the shares of Lanius to Mr. Buscher;

    d.  Edelman's refusal to acknowledge Mr. Buscher's ownership interest in Sirius (which exists by virtue of his ownership interest of Lanius);

    e.  Edelman's conduct in blocking Mr. Buscher from participating in Sirius or getting any financial information about Sirius;

    f.  Edelman's conduct in blocking Mr. Buscher from participating in Sirius' business dealings with Supermajor, which is to the ultimate detriment of Sirius (and by extension, Mr. Buscher, as one of Sirius' owners);

436.   Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties to each other, for Mr. Buscher to ascertain his rights as a Lang, Lanius, and Sirius shareholder, and for Mr. Buscher to receive access to all information concerning Sirius and its business venture with Supermajor.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Buscher prays for Judgment against Edelman as follows:

    1.    Declaratory Relief;

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

1
2.      For an order temporarily, preliminarily, and permanently enjoining
2    Edelman from transferring assets out of Lanius;

3
3.      For an order temporarily, preliminarily, and permanently enjoining
4    Edelman from making business decisions regarding Sirius or Supermajor on behalf
5    of Lanius without Mr. Buscher's knowledge and approval;

6
4.      For an order directing Edelman to issue 50% of the shares of Lanius to
7    Mr. Buscher;

8
5.      For an order directing Edelman to issue 50% of the shares of Lang to
9    Mr. Buscher;

10
6.      For an order directing Edelman to appoint Mr. Buscher to the Board of
11   Directors of Lanius;

12
7.      For an order directing Edelman to appoint Mr. Buscher to the Board of
13   Directors of Sirius as a representative of Lanius;

14
8.      For costs of suit incurred herein, including reasonable attorneys' fees,
15   costs, and expenses as allowed by law;

16
9.      For compensatory, punitive, and exemplary damages;

17
10.     For prejudgment interest at the legal rate; and

18
11.     For such other relief as the Court may deem just and proper.

19

20   Dated: October 21, 2020          **HOLMES TAYLOR COWAN & JONES LLP**

21

22                                    By: /s/ Joel M. Athey
23                                         Joel M. Athey

24                                    Attorneys for Plaintiff
                                      STEPHEN BUSCHER
25

26

27

28

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

81

# JURY DEMAND

Plaintiff hereby demands trial by jury of all claims and issues properly triable by jury.

Dated: October 21, 2020             **HOLMES TAYLOR COWAN & JONES LLP**


By: /s/ Joel M. Athey
       Joel M. Athey

Attorneys for Plaintiff
STEPHEN BUSCHER